INTERNATIONAL MINING CO., INC., Plaintiff,

v.

ALLEN & CO., INC., Defendant.

No. 80 Civ. 3750 (RWS).

United States District Court, S.D. New York.

June 11, 1983.

Steven M. Kramer, Needle, Feldman & Herman, Philadelphia, Pa., Barr & Bello, New York City, for plaintiff; Michael R. Needle, Philadelphia, Pa., of counsel.

Titus, Marcus & Shapira, Pittsburgh, Pa., Holtzmann, Wise & Shepard, New York City, for defendant; Daniel H. Shapira, Bernard D. Marcus, Pittsburgh, Pa., of counsel.

## OPINION

SWEET, District Judge.

Defendant Allen & Co., Inc. ("Allen") has moved pursuant to Fed.R.Civ.P. 56 for sum-

mary judgment dismissing the complaint of plaintiff International Mining Co., Inc. ("IMCO"). Allen has also moved pursuant to Fed.R.Civ.P. 37 to dismiss the complaint for IMCO's failure to comply with certain discovery orders issued by this court. For the reasons stated below, the motions will be granted.

## Prior Proceedings

IMCO commenced this diversity action in July, 1980 seeking damages for tortious interference with contract. IMCO is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. One of IMCO's business activities is the brokerage of coal. Allen, a New York corporation with its principal place of business in New York City, is engaged in the investment banking business.

The amended complaint asserts that a contract between IMCO and a third party, Kittanning Coal Co., Inc. ("Kittanning"), was repudiated pursuant to the "directions" of Allen and that this was done without any business justification and was undertaken out of spite. IMCO seeks damages of $500,-000 in lost commissions under the brokerage agreement and $1,000,000 in lost sales of coal. Punitive damages "in excess of $1,000,000" are also sought.

Initially, Allen sought dismissal of the action for failure to state a claim for relief, as well as a stay, alleging that the same issues were before a state court in Pennsylvania in a proceeding commenced by IMCO against Kittanning in which Kittanning had asserted counterclaims and additional claims. The motion to dismiss was denied and, though the motion for a stay was also denied in the same opinion dated December 11, 1981, the parties were given one year in which to conduct discovery. After additional motion practice involving disputes over discovery and disqualification of counsel for Allen, a pretrial conference was held on January 6, 1983, and an order was entered on January 14, 1983 extending the discovery deadline to March 5, 1983, and directing the parties to file all pretrial motions by March 5, 1983.

## Facts

The agreement at issue, which was allegedly entered into on February 22, 1979, is embodied in a two-page document entitled "Exclusive Sales Agreement." The agreement states that it is entered into between IMCO, "through" Black Diamond Sales Co., and Kittanning and grants IMCO the exclusive right to act as broker for Kittanning's coal for a one-year period commencing on February 22, 1979.

Kittanning was incorporated in November, 1978 as a shell corporation by Bally Coal Co., Inc. ("Bally") and Bally's principals Joseph Ripp ("Ripp") and Peter Fitzpatrick ("Fitzpatrick") for the purpose of acquiring and operating a coal washing plant. At that time, the plant was owned by Kitt Coal Company ("Kitt"). Fitzpatrick approached Allen sometime in November, 1978 and proposed that he and Ripp join forces with Allen as the financial backer in order to purchase and operate the plant.

Allen and Bally entered into a shareholders agreement on March 1, 1979. Pursuant to this agreement, Bally and Allen were each to invest $250,000 in the working capital of Kittanning, and Allen was to provide a loan of $1,500,000 to finance the purchase of the coal washing facility. The acquisition was closed on March 7, 1979. Allen turned over a $1,500,000 certified check as well as a $250,000 check which was deposited in Kittanning's newly opened bank account. Fitzpatrick came to the closing with a deposit slip reflecting a deposit of $250,000 to Kittanning's new account.

Kittanning commenced operations. At this time, Ripp and Fitzpatrick were the President and Vice President of Kittanning, respectively, in addition to being directors. The other directors, all representatives of Allen, were Robert Werbel ("Werbel"), a New York attorney whose firm was counsel to Allen, who had participated in structuring and closing the acquisition for Allen, Frank Blair ("Blair"), who acted as Chairman of the Kittanning board, and Roland Crandall ("Crandall"). Blair and Crandall

were both officers of Allen. Werbel was also Kittanning's Secretary. Shortly after March 8, 1979, Allen sold a beneficial interest in certain of the Kittanning securities to Werbel, Blair, and several other persons, corporations, and trusts associated with Allen.

Pursuant to the shareholder's agreement, Ripp and Fitzpatrick agreed to devote substantially all their time to the day-to-day operations of Kittanning. Allen, on the other hand, viewed Kittanning as an investment. The Allen designees saw their role as keeping a "weather eye" on the investment and the progress of the company.

In May, 1979, Ripp and Fitzpatrick advised Allen that Kittanning had a cash flow problem and suggested that Bally and Allen should inject more working capital into the company. On May 23, 1979, Allen advanced Kittanning the sum of $200,000 in return for Kittanning's promissory note signed by Fitzpatrick. At the same time, Bally represented to Allen that it had also made a cash advance to Kittanning secured by a promissory note, but in the lesser sum of $100,000.

Despite this infusion of cash, a series of events revealed serious problems. In August, 1979 Kittanning failed to make a mortgage payment due to Allen. Ripp and Fitzpatrick represented to Blair later that month that Kittanning was out of money. In September, 1979, either Werbel or Crandall received a telephone call from the accounting firm appointed to perform quarterly audits of Kittanning's financial statements to the effect that certain books and records were not at the Kittanning facility and that Ripp and Fitzpatrick and their accountant had failed to keep several appointments. Later in September, Werbel and Blair received telephone calls from a Special Agent of the Federal Bureau of Investigation ("FBI"). The agent stated that he had information from a confidential source that Ripp and Fitzpatrick were stealing from Kittanning.

Shortly thereafter, Ripp and Fitzpatrick came to New York and stated that they still had faith in Kittanning and that they had partners who were interested in acquiring Allen's interest in the company. Ripp claimed that within a couple of weeks a partner of his called Black Diamond would be in a position to close such a transaction. However, nothing came out of this proposal.

In early October, 1979, an article in a Florida newspaper came to the attention of Werbel, Blair, and Crandall. The article implicated both Ripp and Fitzpatrick in a scheme to defraud certain persons in Florida. The scheme allegedly involved investments in coal operations. Concerned by these events, Werbel, Blair, and Crandall by a notice dated October 11, 1979 scheduled a special meeting of the Kittanning board for October 17, 1979 in Pittsburgh.

In the meantime, Werbel and Blair telephoned the Kittanning plant manager, H. Lee Buell ("Buell"), and requested a meeting in New York City on October 15, 1979 to review certain of Kittanning's business records. Buell had previously had a telephone conversation with Blair, Werbel, and Crandall in which he informed them that he believed that Ripp and Fitzpatrick were mismanaging Kittanning's operations.

At the meeting in New York, Buell stated that numerous payments of Kittanning's funds had been made to persons having no business relationship with Kittanning. Buell also produced the February, 1979 brokerage agreement that is the subject of this lawsuit. Werbel testified at his deposition that this was the first time he became aware of the existence of this agreement. At the October 15 meeting with Werbel and Blair, Buell questioned the date and the bona fide nature of the IMCO brokerage agreement and pointed out some unusual aspects of the agreement. Buell told Werbel and Blair that he thought the inclusion of Black Diamond in the agreement was unusual and that the firm six percent commission provided for in the agreement was also unusual. He also stated that he had discussed the terms of a brokerage agreement with IMCO and that IMCO had

agreed to an arrangement with terms more favorable to Kittanning than those reflected in the agreement.

Buell also discussed two other matters involving IMCO. He informed Werbel that Ripp had forgiven a $10,000 debt owed to Kittanning by a firm called Energy Engineering, Inc. ("Energy Engineering") in return for an agreement by Energy Engineering to settle a lawsuit it had commenced against IMCO and others. Buell also informed Werbel that IMCO had received four checks totalling $27,000 from Kittanning on March 7 and 8, 1979 immediately following the closing of Kittanning's acquisition of the coal washing facility and prior to the commencement of business operations. Buell stated that he did not know why Kittanning would be paying IMCO this amount of money at such an early date, but he speculated that it may have been in return for a loan which IMCO may have made to Fitzpatrick in order to help finance Bally's end of the acquisition.

Shortly before October 17, 1979, Werbel learned that Ripp and Fitzpatrick had borrowed $80,000 in Kittanning's name from Pittsburgh National Bank without authority and without the knowledge of the other board members. Also shortly before the Kittanning board meeting, Werbel learned that Bally had not made the initial $250,000 contribution to Kittanning.

The special meeting of the Kittanning board was held as scheduled on October 17. Ripp and Fitzpatrick were ousted as officers of Kittanning and Blair was elected President. A resolution was passed rescinding all banking resolutions and authorizations and instructing that all existing bank accounts be closed. Another resolution was passed authorizing the President "to take such steps as he in his sole discretion deems necessary to secure the Company's property from Messrs. Ripp and Fitzpatrick." Neither IMCO nor the IMCO brokerage agreement was mentioned at the board meeting.

The meeting was adjourned, at which time Ripp and Fitzpatrick remained and were questioned extensively concerning their operation of Kittanning. The questioning was conducted by Daniel Shapira, an attorney retained by Blair, Werbel, and Crandall. Neither IMCO nor the IMCO brokerage agreement was mentioned during the questioning.

Later that same day, Werbel drafted letters for signature by Blair as Kittanning's President to several parties who had dealt with Ripp and Fitzpatrick, informing them that these men had been removed as officers of Kittanning and were not authorized to engage in any transactions on its behalf. The letters were sent, *inter alia,* to various hotels, to a travel agency, and to the Pittsburgh National Bank.

One of these letters was sent to IMCO. The IMCO letter stated in part:

In addition, it has recently come to our attention that the Company may have entered into an "Exclusive Sales Agreement" with you, dated February 22, 1979. This is to advise you that any such agreement was never duly authorized by the Company and, accordingly, the Company considers that agreement to be null and void. Moreover, because of the foregoing, we hearby demand return of all funds received by you and arising out of such agreement.

Blair testified at his deposition in this lawsuit that he first heard of the IMCO agreement at the October 17 board meeting and that he disavowed the agreement for the sole reason that it was never authorized by the Kittanning board. Crandall testified at his deposition that prior to this lawsuit he had never heard of IMCO. IMCO was replaced as Kittanning's broker by Courtney Foos Coal Co., Inc. ("Foos").[1]

*The Motion for Summary Judgment*

██ Preliminarily, this court notes that IMCO's papers submitted in opposition to

1. The parties are in dispute as to the terms of Allen's brokerage agreement with Foos. IMCO asserts that Foos has received an average com-

mission of 11% on its sales of Kittanning coal, roughly double the 6% provided for in the terminated IMCO agreement. The 11% figure

this motion are seriously deficient. First, it has not complied with S.D.N.Y. Civil Rule 3(g), which requires a party opposing summary judgment to submit a "short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Second, the only affidavits it has submitted are attorney's affidavits, but Rule 56(e) requires that affidavits be made on personal knowledge. Third, the affidavits submitted by IMCO make many factual allegations without even citing to the record, let alone attaching copies of the papers referred to as required by Rule 56(e). This court is left, therefore, to wade through a voluminous record to seek substantiation for IMCO's position. These deficiencies are sufficient in themselves to justify granting Allen's motion for summary judgment. *See SEC v. Research Automation Corp.,* 585 F.2d 31, 34 (2d Cir.1978); *Jecies v. Matsuda,* 503 F.Supp. 580, 586 (S.D.N.Y.1980) (failure of plaintiff to submit Civil Rule 3(g) [formerly 9(g) ] statement is sufficient ground to grant defendants' motion for summary judgment). Nevertheless, despite IMCO's dereliction in this regard, an effort has been made to divine IMCO's position and to address its arguments.

A threshold question exists as to the appropriate legal standard to be applied to IMCO's claim of tortious interference with contract. The parties have not on this motion briefed the question whether New York's choice of law rules require the application of New York or Pennsylvania substantive law. In an earlier opinion denying Allen's motion to dismiss, pursuant to Fed. R.Civ.P. 12(b)(6), this court stated that both New York and Pennsylvania recognized the same elements of the tort. *International Mining Co. v. Allen & Co.,* No. 81 Civ. 3750 (S.D.N.Y. Dec. 11, 1981) (citing *Ebasco Servs., Inc. v. Pennsylvania Power & Light Co.,* 402 F.Supp. 421, 452 (E.D.Pa.1975)). Both states have, in fact, approved the interpretation of the tort contained in the Second Restatement, which defines the elements as (1) an intentional act, (2) improperly done, which (3) interferes with the performance of a contract. *Restatement (Second) Torts* § 766 (1977). *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 431, 393 A.2d 1175, 1183 (1978), *appeal dismissed,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 194, 428 N.Y.S.2d 628, 634, 406 N.E.2d 445, 448 (1980). The New York and Pennsylvania cases also recognize that a so-called "privilege" attaches when the interference with contractual relations is done in order to further a legitimate interest. *See Glenn v. Point Park College,* 441 Pa. 474, 482, 272 A.2d 895, 899 (1971); *Felsen v. Sol Cafe Mfg. Co.,* 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610, 613, 249 N.E.2d 459, 461 (1969). *See also DuSesoi v. United Refining Co.,* 540 F.Supp. 1260, 1275 (W.D.Pa. 1982). As the Restatement (Second) makes clear, this rule is simply a recognition that interference with contractual relations is not "improper" if it is done for legitimate purposes. *See Restatement (Second) Torts* § 767 comment b (1977). The Restatement (Second) also suggests a balancing process for assessing whether the alleged interference is improper:

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

was arrived at through a calculation using figures from shipments of coal received by Foos on sales to Philadelphia Electric Co., Inc. for the period October 31, 1979 to January 22, 1982. The use of this period is erroneous, of course, since the term of the IMCO agreement expired on February 22, 1980. When the figures are recalculated correctly, as Allen has done, *see* Memorandum in Response dated March 18, 1983, the result shows that Foos received a straight profit of roughly 5%, which is less than the 6% of the IMCO agreement. In addition, the arrangements by which Foos did business with Kittanning differed from those of the IMCO agreement, and a straight comparison of profit earned does not therefore accurately reflect the relative advantage to Kittanning of the two agreements.

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Id.* § 767. This balancing process need not be performed, however, in cases involving a more or less crystallized privilege; rather, the court need only apply the privilege to the facts of the particular case. *See id.* comments j & l.

IMCO does not dispute that the actions taken by the Allen representatives on the Kittanning board may fall within the scope of the privilege. Indeed, whether one views their actions in their capacities as directors of Kittanning or as representatives of one of Kittanning's major shareholders and creditors, the privilege may attach. *See DuSesoi v. United Refining Co.,* 540 F.Supp. 1260, 1275 (W.D.Pa.1982) (officers and directors of corporation privileged to interfere with contractual relations between corporation and third parties); *Brierwood Shoe Corp. v. Sears, Roebuck & Co.,* 479 F.Supp. 563, 565 (S.D.N.Y.1979) (majority shareholder); *O'Neill v. ARA Services, Inc.,* 457 F.Supp. 182, 188 (E.D.Pa.1978) (officers). *See also Fury Imports, Inc. v. Shakespeare Co.,* 554 F.2d 1376, 1383 (5th Cir.1977) (applying New York law), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 349 (1981); *Morse v. Swank, Inc.,* 493 F.Supp. 110, 116–17 (S.D.N.Y.1980). IMCO contends, however, that the privilege does not apply because the Allen representatives did not act in furtherance of any legitimate interests when they terminated the brokerage agreement, but rather acted out of spite and ill will. Allen, of course, denies this contention and argues that the actions of Blair, Werbel, and Crandall were undertaken to protect the legitimate economic interests of Kittanning.

■ To support these contentions, the parties draw conflicting inferences from the undisputed facts as recited above. Obviously, since we deal here with questions of motivation we must also necessarily deal with inferences. This is a particularly delicate task on a motion for summary judgment. Our Court of Appeals has consistently cautioned that summary judgment is usually inappropriate in such situations. The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975), and the moving party bears the burden of establishing that no relevant facts are in dispute, *id.* at 1319. Nevertheless,

> properly employed, summary judgment is a useful device for unmasking frivolous claims and putting a swift end to meritless litigation. Thus, the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party. The litigant opposing summary judgment, therefore, "may not rest upon mere conclusory allegations or denials" as a vehicle for obtaining a trial. Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.

*Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (citations omitted; emphasis in original).

Allen's position, simply stated, is that the action taken to terminate the IMCO agreement was done solely to promote the economic interests of Kittanning and that the evidence does not permit the inference that the motivation for the termination was improper. Allen points to the fact that Ripp's and Fitzpatrick's misdealings had come to light; that Buell had questioned to Werbel whether the IMCO agreement was bona

fide; that Buell raised with Werbel the question of the $27,000 payment to IMCO and the relinquishment of the $10,000 claim against Energy Engineering; and that the IMCO agreement was not authorized by the Kittanning board. From all this, Allen argues that the termination was only for proper business reasons. Blair has testified that he sent the termination notice solely because the agreement was not authorized by the Kittanning board. Werbel has testified, however, that he suspected IMCO of having participated with Ripp and Fitzpatrick in their misdeeds with respect to Kittanning.

IMCO, on the other hand, has a theory. It contends that Werbel caused the termination of the brokerage agreement as part of a scheme to cover up his own alleged negligence in allowing Ripp and Fitzpatrick to loot Kittanning, and that IMCO was utilized as a scapegoat. IMCO also asserts that the board members were "humiliated" and "outraged" at having been "ripped off" by Ripp and Fitzpatrick and therefore "struck out" at everyone who did business with them, including IMCO. IMCO states that it was "simply cashiered along with other creditors and persons doing business with [Kittanning] through Ripp and Fitzpatrick on the arbitrary ground that they had done business with [Kittanning] through Ripp and Fitzpatrick." [2]

IMCO points to several factors to support this inference. First, the fact that IMCO was not mentioned at the October 17, 1979 board meeting or during the subsequent questioning of Ripp and Fitzpatrick is said to indicate that the letters sent to IMCO and others later that day were not sent for business reasons, but were sent only because the recipients did business with Ripp and Fitzpatrick. Second, the fact that Blair and Crandall did not suspect IMCO of having engaged in any wrongful conduct at

the time the letters were sent is claimed to support the inference that Werbel, contrary to his deposition testimony in this lawsuit, also did not harbor such suspicions at that time. Third, the simple fact that Allen was defrauded by Ripp and Fitzpatrick allegedly supports the inference that Blair, Werbel, and Crandall were "angry" and took their anger out on parties who had done business with Ripp and Fitzpatrick. Fourth, the letter constituting the termination made no mention of wrongdoing, thus supporting the inference that the termination was not brought about for business reasons.

IMCO's theories are insufficient to satisfy its burden of bringing to this court's attention "some affirmative indication that [its] version of the relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp., supra,* 613 F.2d at 445. IMCO has not presented any extrinsic evidence to support its claims that Werbel was negligent with respect to the operation of Kittanning or that he engaged in a scheme to cover up his alleged negligence or that the Allen representatives on the Kittanning board were "humiliated" by the misdeeds of Ripp and Fitzpatrick. Indeed, the evidence negates the allegation that Werbel engaged in a cover-up. On the contrary, he participated along with the other Allen nominees in an investigation designed to uncover the extent of the fraud perpetrated in connection with the operation of Kittanning. His conduct is wholly inconsistent with an effort to hide any sort of negligence. Furthermore, IMCO never explains how the termination of the IMCO agreement would have facilitated such a cover-up. IMCO asserts that it was used as a "scapegoat," but there is not a shred of direct evidence to support this claim, nor is it a reasonable inference from the evidence of record.

The sole reasonable inference from the undisputed facts of record is that the moti-

2. Parenthetically, IMCO also has explanations for the circumstances that led Werbel to suspect collusion between IMCO and Ripp and Fitzpatrick. Indeed, the bulk of its opposition to this motion is dedicated to arguments in support of these explanations rather than to addressing Allen's points.

vation behind the termination of the IMCO agreement was a desire to protect the economic interests of Kittanning. No malice, spite, ill will, or other improper motive has been shown. Werbel may have suspected that IMCO had somehow participated in the wrongdoing perpetrated by Ripp and Fitzpatrick, but there is no evidence that this suspicion motivated him to "strike out" at IMCO, as IMCO has alleged. Rather, the evidence indicates that he, along with Blair and Crandall, acted solely to protect the interests of Kittanning at all times after the severe nature of the company's problems had come to light.

■ It is true, of course, that on a motion for summary judgment this court cannot try issues of fact; it can only determine whether there are issues to be tried. *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1979) (quoting *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir.1967)). Also, summary judgment is likely to be inappropriate in cases where the issues involve intent. *Id. See EEOC v. Home Ins. Co.,* 672 F.2d 252, 256–57 (2d Cir.1982). Based on the foregoing analysis, however, this court concludes that there are no issues to be tried in this case. Even drawing all reasonable inferences in IMCO's favor, *see Quinn v. Syracuse Model Neighborhood Corp., supra,* 613 F.2d at 445, its version of the facts is not supported by the record and is not sufficient to overcome the convincing presentation made by Allen. *See id.*

■ Under these circumstances, the well-recognized privilege of officers directors, officers, and creditors to interfere with contracts in the furtherance of their legitimate business interests attaches, *see* discussion *supra,* and Allen is entitled to judgment in its favor as a matter of law. *See Restatement (Second) Torts* § 767 comments j & l (determination of question of tortious interference may be made as matter of law in circumstances involving privilege).[3]

### The Motion to Dismiss

Allen has also moved pursuant to Fed.R. Civ.P. 37(b) to dismiss IMCO's complaint for failure to comply with an order of this court. For the reasons set forth below, this motion will be granted as an alternative ground for dismissal of this action.

Allen served interrogatories and a request for production of documents on IMCO on January 21, 1983. Neither answers nor production were forthcoming within the thirty-day time period required by Fed.R. Civ.P. 33(a) and 34(b). On February 24, 1983 Allen, faced with this court's pretrial order that discovery be completed and all motions filed by March 5, 1983, served and filed a motion pursuant to Fed.R.Civ.P. 37(a) to compel discovery or, in the alternative, to dismiss the complaint. Oral argument was held on the discovery motion on Friday, March 18, 1983 at the same time as oral argument on the motion for summary judgment. At that time, counsel for IMCO represented to this court that the interrogatory answers and the document production would be supplied forthwith. Accordingly, this court entered an order on March 23, 1983 denying Allen's motion "on the representation of counsel that answers and documents have been supplied." As of March 31, 1983, however, IMCO had not in fact produced the answers or documents. Allen then served and filed a renewed motion seeking dismissal of the complaint and other sanctions. On April 4, 1983, IMCO provided answers to the interrogatories. How-

---

3. Allen also contends that it is entitled to summary judgment because Blair, Werbel, and Crandall acted only in their capacities as directors and officers of Kittanning and not "at the direction of" Allen as alleged by IMCO. In support of this contention, Allen has submitted affidavits of Blair and Werbel that state that their actions on October 17, 1979 were taken entirely in their capacities as fiduciaries of Kittanning and that they were not directed by Allen nor did they confer or consult with Allen regarding those actions. However, because summary judgment will be granted as set forth above, this issue need not be reached.

ever, at oral argument held on April 8, 1983 on Allen's motion for sanctions this court inspected the answers provided and found them to be clearly deficient. Among other problems, the answers incorporated numerous documents by reference. *See generally* 4A *Moore's Federal Practice* ¶ 33.25[1] (2d ed. 1982). This court then entered the following order:

> Motion granted to the extent of recovery for fees and expenses in connection with this motion, otherwise denied at this time with leave to renew on these papers in the event that proper answers to interrogatories are not filed by April 18, 1983.

On April 11, 1983 IMCO served its "Supplemental Answers to Defendant's Interrogatories," which supplemented only four of the thirty interrogatories propounded by Allen. These supplemental answers were not signed and sworn to as required by Rule 33(a).

On May 2, 1983, IMCO submitted an affidavit of its President, W.K. Kerschbaumer, swearing to the Supplemental Answers. On April 21, 1983, IMCO served its "Second Supplemental Set of Answers," which supplemented sixteen of the previously answered interrogatories. These answers were not and still are not signed or sworn to. In the meantime, on April 20, 1983, Allen renewed its motion to dismiss in accordance with this court's order of April 8, 1983, noting that IMCO had never responded to Allen's document request and noting deficiencies in IMCO's supplemental answers. IMCO responded with a two-page memorandum stating that its counsel has acted in good faith and that the information sought in the interrogatories has been supplied in depositions. IMCO's memorandum also states that it has proceeded diligently in this action and has laid out its case in detail in opposition to the motion for summary judgment. The memorandum does not address any of Allen's arguments regarding the specific inadequacies in the answers, nor does it explain why no documents have been produced other than to note that it has produced documents in a related lawsuit in Pennsylvania filed by Kittanning.

It is quite clear that IMCO does not take its discovery obligations or this court's orders seriously. It has not responded at all to Allen's document request. Its second supplemental set of answers to interrogatories was served after the time period provided in this court's order of April 8, 1983 and was never signed or sworn to as required by Rule 33. This is, in effect, a failure to answer. *See Cabales v. United States,* 51 F.R.D. 498, 499 (S.D.N.Y.1970), *aff'd,* 447 F.2d 1358 (2d Cir.1971).

Most importantly, even as supplemented the answers remain seriously deficient. Many responses are evasive and written in such cryptic language that they are difficult to understand. In several instances, responses to interrogatories asking for the identity of documents state that documents will be produced, but no effort is made to identify the documents and none have in fact been produced. *See, e.g.,* Interrogatory 2(j). Several other responses state that documents have been produced, but again no effort is made to identify the documents referred to. *See, e.g.,* Interrogatory 13(f).

IMCO's response to interrogatory 13 is a good example of the inadequacies. The interrogatory reads:

> 13. With regard to any and all damages claimed by plaintiff in this action, for each separate category or type of such damage please state:
>
> a. A description of the nature of the damages.
>
> b. The factual basis for plaintiff's claim that these damages were caused by Kittanning's repudiation of the Exclusive Sales Agreement.
>
> c. The total amount of damages of that category or type.
>
> d. The manner in which plaintiff purports to calculate these damages.
>
> e. The date, amount and description of each item of damages.
>
> f. The identity of all documents evidencing these items of damages.

IMCO's initial answer reads:

> 1) All commissions paid to competing brokers for the period October 31, 1979

through February 22, 1980 as calculated from the information as to prices paid Courtney Foos for coal during that period received from PECO and the price paid by Foos to Kittanning during that period as per KCC's invoices. The damages are approximately $120,000.

2) Lost coal sales to Met. Ed. and PSE & G as a result of IMCO's inability to live up to committments [sic] made to them in reliance on having a supply of coal from KCC as evidenced by previous orders obtained by IMCO for KCC from these utilities and their reluctance to deal with IMCO after it was unable to supply them with coal by reason of defendant's interference with contract. The time period for these damages is October 17, 1979 through the present and they are approximately $1,000,000 in commission on such sales.

3) Punitive damages of an amount to be determined by the jury by reason of defendant's malice and spite. Plaintiff intends to ask the jury to award $25,000,-000.00 in punitive damages based upon the wealth of the defendant, and will demand documentation concerning said wealth to be produced at trial and through the testimony of defendant's officials, including but not limited to Herbert Allen.

This answer is at least unresponsive to parts (d) and (f) of the interrogatory. It gives no method for calculations and identifies no supporting documents. This answer is supposedly supplemented in IMCO's Second Supplement which merely states "same as ans. to Int. No. 11." The initial answer to Interrogatory 11 reads:

See answer to interrogatory 9. Additionally, see orders by PS & G and Med. [sic] Ed. to IMCO for coal from Kittanning attached to the affidavit of Michael R. Needle, sworn to September 10, 1981.

Interrogatory 9 finally provides a method of calculation for achieving the $120,000 figure. The method used to calculate the $1,000,000 figure is not revealed in the initial answers to interrogatories 13, 11, or 9, or in the supplemental answers to these interrogatories. Allen is thus left only with the representation that IMCO has suffered "approximately $1,000,000" in damages for lost sales, but no basis for this assertion.

■ Another example is interrogatory 26(b), which reads:

With regard to plaintiff's assertion that plaintiff or its President, William K. Kerschbaumer, loaned the sum of $25,000 to Peter Fitzpatrick and/or Joseph Ripp in March of 1979, please state:

.  .  .  .  .

f. The date, location, participants, circumstances and contents of all communications between the lender (and its or his agents) and the borrower (and its, his or their agents) in which the loan was proposed, discussed or negotiated.

IMCO's answer simply reads: "See deposition of Lee Buell." Incorporation by reference to a deposition is not a responsive answer. As the Hon. Edward Weinfeld of this court has noted, "[t]he fact that a witness testified on a particular subject does not necessarily mean that a party who is required to answer interrogatories adopts the substance of the testimony to support his claim or contention. Answers to interrogatories should be in such form that they may be used upon a trial, as Rule 33 contemplates." *J.J. Delaney Carpet Co. v. Forrest Mills, Inc.*, 34 F.R.D. 152, 153 (S.D.N.Y. 1963). *See Martin v. Easton Pub. Co.*, 85 F.R.D. 312, 315 (E.D.Pa.1980); 4A *Moore's Federal Practice* ¶ 33.25[1] at 33–130 (2d ed. 1982). The answer to Interrogatory 3(d) is similarly deficient. The interrogatory asks for:

The identity of any persons who requested that Black Diamond be made a party to WKK 4 [the February 22, 1979 brokerage agreement] the date on which they did so, whether they did so in face-to-face conversation, by telephone or in writing, and the reasons given for adding Black Diamond as a party.

The answer reads:

ripp [sic] and Fitzpatrick—face to face—February 22, 1979 *

Another example is interrogatory 2(j), which asks for the "identity of all documents evidencing" matters in connection with the execution of the February 22, 1979 brokerage agreement. IMCO's first answer was as follows:

Exhibit 4 to deposition of William K. Kerschbaumer KCC [Kittanning] invoices IMCO 1 through 9. All correspondence between IMCO and purchasers of coal.

In its supplemental answers, IMCO adds:

Plaintiff believes that such correspondence has been produced but will produce it again.

It has not done so.

In sum, IMCO did not produce answers and documents in response to Allen's initial discovery requests. When Allen moved to compel discovery, IMCO's counsel represented in open court that production was forthcoming. It was not. Allen was forced to file another motion to compel. In the meantime, IMCO filed answers to Allen's interrogatories that were woefully deficient. This court then awarded Allen its expenses on these motions and ordered production of answers by April 20, 1983. IMCO has yet to respond to Allen's document requests and its supplemental interrogatory answers, the second set of which were filed late and are still unsigned and not sworn to, fail to cure the inadequacies.

These events should be viewed in the context of the schedule for discovery and pretrial proceedings established by this court. As recounted above, following Allen's initial motion to dismiss, which was denied in December, 1981, the parties were given one year in which to conduct discovery. This was done primarily in the hope that the related Pennsylvania State court action could be resolved in the meantime. It subsequently became clear that trial was not imminent in Pennsylvania. Thus, the discovery deadline for this action was set for March 5, 1983 and the parties were directed to file all pretrial motions by the same date.

In the face of this proscription, IMCO's first response to Allen's interrogatories, which were propounded in January, 1983, came on April 4, 1983, some two weeks after oral argument on Allen's motion for summary judgment and one month after the close of discovery. IMCO's dilatory conduct is unexplained.

Allen urges that the proper sanction for IMCO's dereliction is dismissal of the complaint pursuant to Fed.R.Civ.P. 37(b)(2)(C). The use of this harshest of sanctions is limited to cases involving "willfulness, bad faith, or any fault" on the part of the disobedient party. *Societe Internationale v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958). Our Court of Appeals has held that gross negligence qualifies as "fault" under this doctrine. *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1065–66 (2d Cir.1979).

The sanctions available under Rule 37 should be employed with a view toward the three purposes they serve. First, they ensure that a party will not be able to profit from its own failure to comply with the requirements of discovery. *Id.* at 1066. Thus, a relevant consideration in choosing the appropriate sanction is the extent to which the other party's preparation for trial has been prejudiced. *Black Panther Party v. Smith,* 661 F.2d 1243, 1255 (D.C.Cir.1981), *vacated and remanded on other grounds,* —— U.S. ——, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982). Second, the sanctions act as specific deterrents in that they seek to secure compliance with the particular order at hand. *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., supra,* 602 F.2d at 1066. Third, the general deterrent effect in enforcing strict adherence to the responsibilities litigants owe to the court and their opponents is served. *Id.* at 1066–67. *See Roadway Express, Inc. v. Piper,* 447 U.S.

752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980); *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976); *Black Panther Party v. Smith, supra,* 661 F.2d at 1256. *See generally* Note, *The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions,* 91 Harv.L.Rev. 1033 (1978). As the Court of Appeals for the District of Columbia Circuit has noted, the general deterrence purpose:

> has special significance in the case of interrogatories which are supposed to be severed [sic] and answered without the need for judicial prompting. Indeed, Rule 37(d) plainly requires a party receiving interrogatories to make one of two responses: an answer or a motion for a protective order. If parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules.

*Dellums v. Powell,* 566 F.2d 231, 235 (D.C. Cir.1977) (citations omitted). The choice of the appropriate sanction lies within the discretion of the court after consideration of the full record in the case. *National Hockey League v. Metropolitan Hockey Club, Inc., supra,* 427 U.S. at 642, 96 S.Ct. at 2780; *Diapulse Corp. of America v. Curtis Pub. Co.,* 374 F.2d 442, 447 (2d Cir.1967).

■ This court has considered the above-enumerated factors and has determined that dismissal of the complaint is the appropriate sanction under the circumstances presented here. IMCO's complete failure to produce documents, after the representation of its counsel in open court that production was forthcoming, can only be described as willful and shows its disrespect not only for its discovery obligations, but also for this court. Its intransigence in supplying adequate answers to Allen's interrogatories rises at least to the level of gross negligence. Indeed, the answers are

sufficiently inadequate that an inference of willfulness is not unreasonable. IMCO has offered no excuse to explain its initial failure to answer. It could have sought a protective order if it considered Allen's requests too burdensome or otherwise objectionable, but it has not done so. Its second supplemental answers are not signed or sworn to and, as such, are not answers at all.

IMCO's defense on this motion is that it has proceeded in good faith and has laid out its case in its opposition to Allen's motion for summary judgment. It is required, however, to lay out adequate answers to interrogatories in a form to allow their use at trial as Rule 33 contemplates. It is not relieved of this duty simply because it has provided its theory of the case to the other side in attorneys' affidavits in response to a motion.

Furthermore, Allen has been prejudiced by IMCO's conduct. It was forced to file its motion for summary judgment without the benefit of discovery that it is entitled to. It still has not received documents or adequate answers to interrogatories. As noted, some of the interrogatories are so unresponsive as to be useless. A particularly egregious example is IMCO's response to Allen's interrogatory regarding the claim for $1,000,000 in damages from lost sales. No basis is given for this claim or for how this figure was arrived at.

■ Dismissal is, of course, a harsh sanction and should be invoked only as a last resort. *See Black Panther Party v. Smith, supra,* 661 F.2d at 1255; *Marshall v. Segona,* 621 F.2d 763, 768 (5th Cir.1980). *Cf. Harding v. Federal Reserve Bank of New York,* 707 F.2d 46 (2d Cir.1983). This court has already awarded Allen its expenses incurred in bringing on these motions. IMCO's total failure to produce documents and the pervasive nature of the inadequacies of its answers to interrogatories render it either ineffective or infeasible to employ the other sanctions provided by

Rule 37(b)(2). For example, even if Allen's motion for summary judgment were denied and this case went to trial, it would not be feasible to order certain facts to be taken as established or to prohibit IMCO from introducing particular matters in evidence. Fed. R.Civ.P. 37(b)(2)(A) & (B). Also, since there is only a single claim, refusing to allow support of that claim would be tantamount to dismissal, as would striking out portions of IMCO's pleadings. *Id.* Rule 37(b)(2)(B) & (C). Further, since IMCO had several opportunities to comply with the rules governing discovery, there is no reason to believe that the sanction of contempt would be of any use.

Indeed, these lesser sanctions would be inappropriate here because this court views this case as a particularly appropriate vehicle for implementing the general deterrent purpose of Rule 37(b)(2)(C). The Supreme Court has stated that "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Roadway Express, Inc. v. Piper, supra,* 447 U.S. at 763–64, 100 S.Ct. at 2462–63 (quoting *National Hockey League v. Metropolitan Hockey Club, Inc., supra,* 427 U.S. at 643, 96 S.Ct. at 2781). Our Court of Appeals has stated that "in this day of burgeoning, costly and protracted litigation courts should not shrink from imposing harsh sanctions where . . . they are clearly warranted." *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., supra,* 602 F.2d at 1068. This is such a case.

Naturally, a litigant's due process rights are implicated when its claims are extinguished on a motion under Rule 37. However, dismissal of IMCO's complaint will not deprive it of due process. It has had ample opportunity to be heard on this motion and certainly was aware that its failure to comply with the discovery rules and the orders of this court could result in dismissal. Indeed, Allen has been forced to move three times for dismissal due to IMCO's conduct.

For the reasons stated above, the motion for summary judgment is granted and the motion to dismiss is granted.

The clerk is directed to enter judgment dismissing the complaint.

IT IS SO ORDERED.