**CANDERM PHARMACAL, LTD.,**
Plaintiff–Appellee,
Cross–Appellant,

**Sylvia Vogel, Plaintiff, Cross–Appellant,**

v.

**ELDER PHARMACEUTICALS, INC.,**
Defendant–Appellant,
Cross–Appellee,

**ICN Pharmaceuticals, Inc.; SPI Pharmaceuticals, Inc., Defendants,**
Cross–Appellees.

Nos. 87–3352, 87–3368.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 20, 1988.
Decided Dec. 1, 1988.

Eric M. Oakley, argued, Miriam R. Arfin, Squire, Sanders & Dempsey, Cleveland, Ohio, for appellant, cross-appellee.

Ralph W. Gallagher, Gallagher, Milliken & Stelzer, Bryan, Ohio, John C. Milliken, argued, for appellee, cross-appellant.

Before WELLFORD and BOGGS, Circuit Judges, and PECK, Senior Circuit Judge.

BOGGS, Circuit Judge.

Elder Pharmaceuticals, Inc. (Elder) appeals from the trial judge's ruling refusing to submit to the jury its defense that it had timely revoked its anticipatory repudiation. Canderm Pharmacal, Ltd. (Canderm) cross-appeals, as does Canderm's President, Sylvia Vogel. Canderm filed its complaint on December 17, 1984 against Elder, Elder's parent corporation (SPI), and another SPI subsidiary (ICN) for breach of contract, tortious interference with contractual relations, and personal damages on behalf of Sylvia Vogel (Vogel), Canderm's President and sole shareholder. Elder counterclaimed for injury to its reputation and loss

of sales. This court has diversity jurisdiction under 28 U.S.C. § 1332.

The trial court made a number of pretrial rulings and findings. First, it granted ICN's motion to dismiss for lack of personal jurisdiction, thereby eliminating ICN as a party. Later, it granted defendants' motion for summary judgment, dismissing SPI from the case and limiting the issues for trial between Elder and Canderm to the breach of contract claims. In its memorandum and order of summary judgment, the court made a number of findings: (1) Ohio law precludes an action for breach of an implied covenant of good faith and fair dealing; (2) SPI was privileged to interfere with the contract, so Canderm's claim of tortious interference must fail; (3) Vogel lacked standing although she was President and sole shareholder of Canderm; (4) Vogel had alleged no personal injuries; (5) the defendants had not acted with malice; and (6) the acts of SPI were the acts of Elder so that there could be no tortious interference with the contract between Canderm and Elder. The court further ruled that Elder had anticipatorily repudiated the contract, and would not let the jury consider Elder's contentions that it had timely revoked any repudiation. The jury trial was thus limited to the issue of fixing the amount of damages. The jury awarded Canderm $706,938.00 in Canadian dollars. Based on the then-existing exchange rate, the judge entered judgment for Canderm in the amount of $537,767.73 in American dollars. Elder, Canderm, and Vogel filed notices of appeal.

We affirm on all issues except on the issue of Elder's alleged revocation of its anticipatory repudiation.

I

The facts underlying this action are as follows. Canderm is a Canadian pharmaceutical distributor with its principal place of business in Montreal, Quebec. Elder is an Ohio corporation that manufactures pharmaceuticals. On July 1, 1973, Canderm and Elder entered into a contract granting Canderm the exclusive right to distribute Elder products in Canada. The contract contained two relevant provisions: first, for the agreement to continue, Canderm's sales must be equal to or greater than 9.8% of Elder's domestic sales in the United States; and, second, Vogel must continue to be the majority shareholder in Canderm. In addition, the contract was renewable at Canderm's sole option. The first contract term was one year, the second was four years, and the third was five years. Canderm notified Elder that it wanted to renew the contract in 1974, 1978, and 1983. In 1983, the president of Elder acknowledged Canderm's right to renew in 1988. Canderm's sales of Elder products grew from $25,000 to $470,000 from 1973 to 1983.

In March, 1984, SPI notified Canderm that it had bought Elder and that, effective June 30, 1984, the contract would be cancelled. SPI was the parent company of ICN Canada Ltd., and the undisputed motivation for SPI's cancellation of the contract between Elder and Canderm was to transfer the distribution rights of Elder products to ICN. There is some dispute over whether SPI's goal was to consolidate its operations, or whether its ultimate purpose was to eliminate Canderm, which allegedly was in direct competition with ICN.

Upon receipt of SPI's letter of cancellation, Canderm immediately notified SPI that it considered that it had a valid contract with Elder and would not allow SPI to cancel. On that same day, April 13, 1984, Canderm submitted an order, and confirmed the order on June 8, 1984. On June 14, 1984, Canderm sent an announcement to other participants in the pharmaceutical industry stating that, though SPI had purchased Elder, Canderm remained the sole Canadian distributor of Elder products. However, on July 3, 1984, ICN sent a letter to Canadian wholesalers saying that future orders of Elder products should be arranged through ICN, and, that month, a shipment of Elder products was sent to ICN.

On August 16, 1984, Canderm secured an interlocutory injunction against Elder and ICN which contained three orders: first, Elder must continue to deal with Canderm

pursuant to the contract; second, Elder could not sell to any company in Canada other than Canderm; and, third, ICN could not sell Elder products in Canada.

On August 21, 1984, Canderm wrote to Elder, saying that it assumed that Elder would comply with the injunction, and confirmed its earlier order with Elder, adding an order for another product. Canderm stated in this letter that if there was no confirmation of the delivery date of this order within ten days, Canderm would tell its customers that Elder products were no longer available in Canada.

Elder initially resisted compliance with the injunction, and voiced its reluctance in a September 19, 1984 letter. At that time, the above-mentioned orders still were outstanding. Canderm placed no further orders with Elder.

On October 15, 1984, the Vice President of SPI proposed a monetary settlement. On October 16, 1984, Canderm announced to the Canadian market that Elder products had been discontinued. Shortly thereafter, on October 29, 1984, Canderm rejected SPI's settlement offer.

On November 12, 1984, SPI wrote Canderm, informing it that SPI had directed Elder to fill Canderm's outstanding orders and asking Canderm to place more orders so that Elder could fulfill the first term of the injunction. Canderm then rejected the shipment of the outstanding order and placed no further orders. Thus, alleging that Canderm was preventing it from complying with the injunction, Elder moved that the court lift the injunction just after Canderm filed the present suit.

On December 1 to 6, 1984, ICN attended a dermatology convention, where it listed itself as the Canadian distributor of Elder products, and a 1985 trade publication also listed ICN as the Canadian distributor of Elder products.

On February 14 and 15, 1985, a hearing on Elder's motion to lift the injunction was held. Vogel, Canderm's president, testified

that Canderm still wanted to purchase and distribute Elder products. The court denied Elder's motion based on this testimony.

On February 27, 1985, Elder's Treasurer, Paul Maier, wrote Canderm saying that Elder was ready to comply with the injunction by resuming performance of the contract, and again asking Canderm to place an order so that Elder could demonstrate its willingness to comply. Canderm did not place such an order, and it let the contract lapse [1] after its inventory of Elder products was depleted. Then, finally, Canderm allowed the injunction to be dissolved.

As noted above, the trial court granted summary judgment in favor of Canderm, made findings on a number of issues, and allowed only the issue of damages to be decided by the jury. The jury awarded Canderm a sizeable sum, and both parties appeal.

## II

On appeal, Canderm argues that the question of SPI's privilege to interfere with the contract is one of fact that should have been submitted to the jury. In addition, Canderm claims that there was a question of fact regarding malice and, so, the issue of malice, as a prerequisite for both a finding of tortious interference and an award of punitive damages, should have gone to the jury. Finally, Vogel claims that the fact that she was a main reason for the contract's existence, as shown by a term conditioning renewal on her continued financial involvement, gave her standing to sue; and, in any case, standing is a question of fact that should have been submitted to the jury.

In its cross-appeal, Elder claims that, although it breached the contract initially, it had timely revoked its anticipatory repudiation, and that the trial judge erred in refusing to submit this issue to the jury, even as it related to fixing the amount of dam-

---

**1.** Elder claims that the contract "lapsed." The only explanation for this terminology is that the contract required that Canderm's sales be equal to or greater than 9.8% of Elder's sales in the United States "each year of [each] renewal period." Once Canderm depleted its inventory, this term of the contract no longer could be met.

ages. In addition, Elder claims that the jury's award of damages, which included damages for lost profits, is not substantiated by the evidence.

### A

The standard of review of a summary judgment is that a summary judgment should be sustained if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A district court "should be extremely hesitant to grant summary judgment on important and complex issues." *Felix v. Young,* 536 F.2d 1126, 1135 (6th Cir.1976) (citations omitted). In addition, summary judgment is "likely to be inappropriate in cases where the issues involve intent." *Int'l Mining Co., Inc. v. Allen & Co., Inc.,* 567 F.Supp. 777 (S.D.N.Y.1983) (citations omitted). *Accord, Smith v. Hudson,* 600 F.2d 60 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

### B

█ The first issue raised in Canderm's appeal is the trial judge's ruling on Canderm's claim of tortious interference with the contract between Elder and Canderm. The Ohio courts have defined tortious interference in the following way: " '[O]ne who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relation with another, or perform a contract with another is liable to the other for the harm caused thereby.' " *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1127 (6th Cir.), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1981) (quoting *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 379 N.E.2d 235 (1977)). Here, Canderm is claiming that SPI interfered with the contract between Elder and Canderm in a way which meets this definition.

The trial judge ruled that SPI was privileged to interfere because it was the parent company of Elder, and, so, was standing in

Elder's shoes. Ohio courts have approved what other courts have referred to as "the well-recognized privilege of officers, directors, officers, and creditors to interfere with contracts in the furtherance of their legitimate business interests...." *Int'l Mining Co., Inc. v. Allen & Co., Inc.,* 567 F.Supp. 777 (S.D.N.Y.1983). Thus, in Ohio, "one is privileged to purposely cause another not to perform a contract with a third person where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract." *Pearse v. McDonald's Systems of Ohio, Inc.,* 47 Ohio App.2d 20, 351 N.E.2d 788 (1975). It would appear, then, that the trial court was correct in its conclusion that SPI, the parent company of Elder, was, in effect, the same entity as Elder, and, so, was privileged to become involved in the relations between Canderm and Elder.

However, Canderm alleges that SPI's purpose for cancelling the Elder–Canderm contract was to eliminate Canderm, which it claims was in direct competition with ICN. Thus, Canderm claims, the trial judge should have allowed the issue of malice, which it claims is an element of tortious interference, to go to the jury. It is true that "the Ohio cases establish tortious interference with contract as a distinct tort with distinct requirements.... One of these clear requirements [is] offering evidence of defendant's intent to interfere with the contract...." *Province, et al. v. Cleveland Press Publishing Co., et al.,* 605 F.Supp. 945, 966 (N.D.Ohio 1985), *aff'd,* 787 F.2d 1047 (6th Cir.1986). However, "[m]alice, in the sense of 'personal ill will, spite or hatred' is not an essential element of the cause of action." *Ibid.* (quoting *Reichman v. Drake,* 89 Ohio App. 222, 100 N.E.2d 533 (1951)). Thus, to be precise, the requirement is one of intent to interfere with contractual relations, not of malice in the usual sense.

Here, though, even if SPI was not privileged to become involved in the relations between Canderm and Elder, and even if Canderm could show intent, as the trial judge found, there simply is no cause of

action in Ohio to sanction the actions Canderm alleges were performed by SPI. Although there is a cause of action for tortious interference in Ohio, *Heheman*, 661 F.2d at 1127, when only a breach of contract is alleged, as here, "the action sounds in contract, not tort in Ohio." *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir.1976) (citing *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922)). "According to *Ketcham* the addition of an averment of malice does not change a contractual action into one in tort." *Ibid.* In its attempt to state a cause of action for some harm other than breach of contract, Canderm only alleges that Elder was "motivated by [SPI's] willful, wanton and malicious attitude toward [Canderm]." (App. 17). Canderm avers that "[s]uch motivation and conduct by [SPI] constitutes a basis for an action in tort, which [Canderm] hereby specifically pleads."

The Ohio courts repeatedly have stated that "it is no tort to breach a contract, regardless of motive." *Ibid.; Hoskins v. Aetna Life Insurance Co.*, 6 Ohio St.3d 272, 452 N.E.2d 1315, 1320 (1983); *Olbrich v. Shelby Mutual Insurance Co.*, 13 Ohio App.3d 423, 469 N.E.2d 892 (1983). Canderm's attempt to transform a breach of contract into tortious interference with contract must fail. "The tort liability of parties to a contract arises from the breach of some positive legal duty imposed by law because of the relations of the parties, rather than from a mere omission to perform a contract obligation." *Battista*, 538 F.2d at 117. Here, such a duty has not been alleged or proved. Thus, Canderm has not stated a claim for tortious interference with contract, and the trial court was correct in granting summary judgment.

### C

■ Once the issue of tortious interference has been disposed of, the issue of punitive damages follows. Because one cannot sue for tortious interference on the basis of a breach of contract in Ohio, one "cannot recover for exemplary damages...." *Battista*, 538 F.2d at 118. "Punitive damages are not recoverable in an action for breach of contract, even though it is alleged that the breach was unlawful, wilful, wanton, and malicious." *R & H Trucking v. Occidental Fire & Casualty Co.*, 2 Ohio App.3d 269, 441 N.E.2d 816, 819 (1981) (citing *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922)).

There are two exceptions to this rule. First, punitive damages are available for a breach of contract if the "case [is] based on allegedly fraudulent and deceitful misconduct" because "warranty and fraudulent misrepresentation [were] grounds originally viewed as sounding in tort." *Levin v. Nielsen*, 37 Ohio App.2d 29, 306 N.E.2d 173, 181 (1973) (citations omitted). Here, although fraud was somewhat vaguely alleged, there was no finding on it by the court below, and there was no separate cause of action stated for fraud or fraudulent misrepresentation. Thus, this case does not fall within this exception.

The second exception applies when "the acts constituting the breach of contract also constitute a cause of action in tort." *Ali v. Jefferson Insurance Co.*, 5 Ohio App.3d 105, 449 N.E.2d 495, 497 (1982). "[W]here the acts constituting the breach of contract are totally unreasonable and oppressive, an award of punitive damages may be made." *Olbrich v. Shelby Mutual Insurance Co.*, 13 Ohio App.3d 423, 469 N.E.2d 892, 894 (1983). Here, as shown above, Canderm has not stated a cause of action in tort; and it cannot be said that the actions taken by Elder were "totally unreasonable and oppressive." *Ibid.* Thus, this exception does not apply, either.

Therefore, because Canderm has stated only a cause of action in contract, punitive damages cannot be recovered, and the trial judge's grant of summary judgment must be affirmed.

### D

■ The trial judge also was correct in finding that Sylvia Vogel, president and sole shareholder of Canderm, did not have standing to sue. Although there does not appear to be case law in this jurisdiction on this issue, other circuits are consistent in holding that "an action to redress injuries

to a corporation ... cannot be maintained by a stockholder in his own name.... The general rule is applicable in cases where the individual is the sole stockholder." *Schaffer, et al. v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir.1968) (footnotes omitted); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439 (9th Cir.1979). *See also Cates v. Int'l Telephone & Telegraph Corp. et al.*, 756 F.2d 1161 (5th Cir.1985) (the same rule applies regarding partnerships).

> [I]t is universal that where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right to recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring [sic] about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership.

*Schaffer*, 397 F.2d at 896–97 (quoting *Martens v. Barrett*, 245 F.2d 844–46 (5th Cir. 1956)).

Vogel claims that she has standing despite this rule because the contract was conditioned on her continued involvement with Canderm. However, in *Sherman*, 601 F.2d at 439 n. 9, the franchise agreement which was at issue provided that if President Sherman, for any reason, left the company, the franchisee could terminate the agreement; in addition, the corporation was indebted to him. The court said that these circumstances did not "warrant departure from the general rule of separation of identities, nor afford Sherman standing to bring suit in his individual capacity...." *Id.* at 439.

The magistrate who analyzed this case for the district court found that the present situation was indistinguishable from the situation in *Sherman*. We agree. There, the agreement was conditional on Sherman's continued involvement with the corporation, just as Vogel was essential to the agreement in this case. Contrary to Vo-

gel's assertions, however, the court in *Sherman* did not find this fact to be significant enough to justify a departure from the general rule. *Ibid.* Thus, Vogel is without standing to sue, and the trial judge's determination on this issue was correct.

### E

■ We now turn to Elder's alleged errors on appeal, and to the most complicated issue in this case. The trial judge ruled that Elder had anticipatorily repudiated the contract between itself and Canderm, and would not allow the jury to consider Elder's contention that it had timely revoked its repudiation. Our conclusion is that the trial judge was incorrect in refusing to submit this issue to the jury. It is difficult to sort out the factual aspects of this issue, and such sorting is necessary to a determination of who is at fault here. By removing this issue from consideration by the jury, even as it may have affected the award of damages, the judge, in effect, decided the most material facts in this case. Thus, this is not an issue that is appropriate for disposition on a motion for summary judgment, and the decision of the trial judge must be reversed. Fed.R.Civ.P. 56(c).

The rule regarding anticipatory repudiation, also called anticipatory breach, was clearly delineated by the Court of Claims in *Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 211 Ct.Cl. 222 (1976).

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between cancelling the contract and continuing it.... If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages.... If he elects instead to continue the contract, the obligations of both parties remain in force....

*Id.* 543 F.2d at 1313 (citations omitted).

This circuit has followed this rule for many years. In *Hettrick Mfg. Co. v. Wax-*

*ahachie Cotton Mills,* 1 F.2d 913 (6th Cir. 1924), this court said

> [t]he promisee, if he pleases, may treat the notice of intention [to breach] as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party, as well as his own. He remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstances which would justify him in declining to complete it.

*Id.* at 919 (quoting *Roehm v. Horst,* 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953 (1900)).

Applying these rules to the facts of the present case, it is clear that SPI repudiated the contract when it wrote to Canderm in March 1984 and said that it had bought Elder and was cancelling the contract. It is equally clear that Canderm refused to accept this repudiation when it responded that it considered the contract alive, would not allow SPI to end it, and submitted an order for Elder products. Thus, according to the above rules, it is at least possible that the jury could have found that Canderm kept the contract alive "for the benefit of the other party, as well as his own." *Ibid.* At this point, then, the jury could have decided that there remained a contract between Canderm and Elder, and that "the obligations of both parties remain[ed] in force." *Cities Service Helex,* 543 F.2d at 1313.

At this point in the relevant series of events, Canderm began a series of extremely ambiguous actions. First, it secured an injunction requiring Elder to comply with the contract. Then, when Elder proposed a monetary settlement, it rejected it. However, it also rejected the shipment of Elder products which Elder sent in compliance with the injunction, and placed no further orders.

SPI claims that it revoked its repudiation when, after Canderm received the injunc-tion, it sent the shipment of Elder products to Canderm. Indeed, a "repudiation is nullified by retraction if notice of the retraction comes to the attention of the injured party before he acts in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final." Restatement (Second) of Contracts § 256 (1979). This rule is consistent with Ohio Rev.Code Ann. § 1302.69 (Baldwin 1961) (UCC § 2–611). The question for the jury then becomes whether Canderm acted "in reliance on the repudiation or indicate[d] to [Elder] that [it] considere[d] the repudiation to be final." *Ibid.*

Because Canderm's actions were so ambiguous, it is difficult to determine whether it "indicate[d] to [Elder] that [it] considere[d] the repudiation to be final." *Ibid.* Canderm did reject the settlement and the shipment, and placed no further orders. However, it did all of these *after* it had secured an injunction against Elder, requiring Elder to comply with the terms of the contract. These acts must be evaluated by the jury to determine whether they affect either the merits or the damages award.

"It is true that a party having repudiated a contract cannot revoke its repudiation if the other party has materially changed its position.... [T]he filing of a complaint ... constitutes such a material change." *Commonwealth Edison Co. v. Decker Coal Co.,* 612 F.Supp. 978 (D.C.Ill.1985). If filing a complaint constitutes a material change, obtaining an injunction, which consists not only of filing a complaint but also of prevailing on it, might be adjudged to constitute such a change. Thus, the jury could have found that Canderm materially changed its position in reliance on the repudiation, that the repudiation was made irrevocable when Canderm obtained the injunction, and, therefore, that Elder's repudiation did not revoke its anticipatory breach of the contract.

However, because the jury could have found that the contract remained in full effect due to Canderm's refusal to accept the repudiation, events which occurred after this point still could have had some effect on the jury's determination regard-

ing the alleged breaches of contract and the parties' liabilities. Indeed, Canderm kept Elder from performing according to the injunction by refusing to order any more products from Elder; yet, it also kept Elder from dissolving the injunction. This could have led the jury to conclude that there was a breach of the contract by Canderm.[2]

This court has said that "[w]here one party to a contract hinders or prevents the completion of a contract, this constitutes a breach of the contract." *Rockwell Int'l Corp. v. Regional Emergency Medical Services of North West Ohio*, 688 F.2d 29, 31 (6th Cir.1982) (citing *Rohde v. Massachusetts Mutual Life Insurance Co.*, 632 F.2d 667 (6th Cir.1980)). "The nonoccurrence or nonperformance of a contract is excused where that failure of the condition is caused by the party against whom the condition operates to impose a duty." *Rohde*, 632 F.2d at 670. By refusing to place more orders, or even to accept a shipment of goods from Elder, Canderm was preventing Elder from performing the contract. According to *Rockwell* and *Rohde*, then, it was possible for the jury to have found that Canderm breached the contract. In addition, the jury could have determined that Canderm was preventing Elder from terminating the contract by refusing to allow it to dissolve the injunction, which could have led the jury to conclude that Canderm put Elder in an impossible situation which diminished or eliminated Elder's liability.

Thus, we hereby remand the case to the trial court so that the factfinder, the jury in this case, can make findings on this issue. This court has, in the past, said that the question of whether repudiation was later retracted "is a factual issue for the jury to determine." *Battista*, 538 F.2d at 118. Thus, the only appropriate course is for this court to remand this issue to the district court for a finding of fact by the jury.

**F**

■ As a consequence of our analysis regarding the alleged breaches of contract, a redetermination of the measure of damages may be deemed appropriate by the jury. Such a redetermination may include damages for lost profits, the subject of Elder's second alleged error on appeal.

The judge instructed the jury that it was "not permitted to award remote or speculative damages," and, further, that it could "not include in [its] verdict compensation for any future loss which, although possible, [was] not reasonably certain to occur in the future." (App. 205). The judge also charged that

> You may award damages for the loss of anticipated profits only if: First, it may reasonably be supposed that such profits were within the contemplation of the parties when the contract was made, as the probable result of a breach; second, such profits are not remote or speculative; and third, such profits may be shown with reasonable certainty. You cannot award damages based upon contingencies unless you find that those contingencies are reasonably certain to occur.

This instruction almost perfectly mirrors the law on awards of damages for lost profits. That rule is that "anticipated profits may be recovered only where such profits could reasonably have been contemplated by the parties as a probable result of the breach; such profits cannot be speculative or conjectural but must be shown with reasonable certainty." *Battista*, 538 F.2d at 119. It is "proper, in proving lost profits to a reasonable certainty, for the parties to show the past profit performance of the enterprise or the amount of profit called for in the contract." *Ibid.* Indeed, there was testimony that Canderm had met the 9.8% goal and would continue to do so.

Because the jury instruction so closely followed the law in this jurisdiction, there was no error committed by the trial judge in formulating that instruction. Unfortu-

---

**2.** Also, at some point, Canderm's sales fell below the required 9.8% of Elder's domestic sales. This, too, could have been found to amount to a breach. Especially because the record does not indicate exactly when this happened, it is a question of fact which the jury must be allowed to consider.

nately, there is nothing in the record to show what formula was used by the jury to determine the amount of lost profits, or to show how much of the award was for lost profits. In fact, there is nothing to show how much 9.8% of Elder's domestic sales would have been. Thus, there is nothing in the record to support or to contradict the jury's award, and the jury should be allowed to inquire into these facts further if it decides that damages for lost profits are appropriate in light of the evidence regarding the alleged breaches of contract.

"The determination of the amount of damages to be awarded is left to the discretion and good judgment of the fact finder as guided by the facts of the particular case." *Smith v. Heath,* 691 F.2d 220 (6th Cir.1982). "Questions raised concerning damages are essentially questions of fact." *Duty v. United States Dept. of Interior,* 735 F.2d 1012 (6th Cir.1984). Keeping these rules in mind, it would seem that a reasonable jury could have awarded the amount that it did. The fact that future profits were awarded, if in fact they were, does not make the award erroneous. Nor does it make it correct. The amount of damages is for the jury to decide, with guidance from the trial judge, as was given in this case. We would suggest, however, that, on reconsideration, should the jury award damages to either party, the trial judge request the jury to specify the basis for its award. This would facilitate review, if any is sought.

### III

In conclusion, we AFFIRM the trial judge's decisions regarding all issues raised in Canderm's appeal. However, we REVERSE and REMAND the issue of Elder's alleged revocation of its anticipatory repudiation for submission to and consideration by the jury, as it relates to both the merits and the measure of damages, should any be deemed appropriate.