946 F.2d 894
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re: FOOTE MEMORIAL HOSPITAL/PCIS LITIGATION.
W.A. FOOTE MEMORIAL HOSPITAL, INC., Plaintiff, Counter
Defendant-Appellant,
v.
FIRST NATIONWIDE BANK, Defendant, Counter Plaintiff-Appellee,
Western Financial Resources, Inc., et al., Defendants.
 No. 90-2087.
 United States Court of Appeals, Sixth Circuit.
 Oct. 8, 1991.
 
 Before RYAN and BOGGS, Circuit Judges, and DOWD, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Foote Memorial Hospital, Inc. ("Foote") appeals the dismissal of its claim for wrongful interference with contractual relations and the grant of summary judgment for defendant First Nationwide Bank ("FNB") on its counterclaim for lease payments. The following issues are before us on appeal:
 
 
 2
 1. Whether the district court properly granted summary judgment in FNB's favor on Foote's complaint;
 
 
 3
 2. Whether the district court properly granted summary judgment in FNB's favor on its counterclaim; and
 
 
 4
 3. Whether the district court properly awarded damages in the amount of $619,841.25 in FNB's favor against Foote.
 
 
 5
 As the district court correctly resolved these issues, we affirm.
 
 I.
 
 6
 On October 15, 1982, Foote entered into an agreement with EDS Corporation for the installation of a computerized Patient Care Information System ("PCIS"). The equipment was purchased for $1,163,273 by Western Financial Resources, Inc. ("WFR"), which borrowed the money from First Nationwide Savings, now known as First Nationwide Bank. WFR, pursuant to a July 7, 1983 agreement, leased the equipment to Foote. Section 10 of the lease agreement provided that Foote could not "assign, transfer or encumber" any rights under the lease without the prior written consent of the lessor, WFR. The agreement also provided that WFR could assign the lease to a financial institution, such as FNB, but that the obligations of the lessee (Foote) "shall not be subject to any reduction, abatement, defense, set off, counterclaim or recoupment for any reason whatsoever...."
 
 
 7
 On September 16, 1983, WFR assigned its interest in the lease agreement to Lancaster Landscapes, Inc. ("Lancaster") without recourse. To secure repayment to FNB, the lender, Lancaster assigned its interest in the lease agreement to FNB without any of the lessor's obligations but with recourse against Lancaster up to $175,000. Pursuant to this assignment, FNB received a security interest in the WFR contract with Foote and the property covered by the lease. Foote acknowledged and consented to this assignment in an August 31, 1983 agreement which provided that Foote would not "enter into any agreement amending, modifying or terminating the Lease without the prior written consent of FNB...." Foote also agreed that if the computer system was defective, it would continue to make monthly payments to the lessor and would look solely to the manufacturer or supplier for the performance of all covenants and warranties.
 
 
 8
 Pursuant to these agreements, Foote paid FNB directly. WFR, however, remained involved. When Foote failed to pay FNB promptly, FNB contacted WFR who prepared a written agreement for Foote to sign which provided automatic payments to FNB.
 
 
 9
 During the installation and implementation of the PCIS, problems developed between EDS, the seller and installer, and Foote. Ultimately, on August 31, 1985, EDS and Foote negotiated a settlement and release agreement requiring EDS to pay Foote $200,000 and assume responsibility for the hardware leased from WFR. The settlement required EDS to obtain the consent of the lessor, WFR, to EDS' assuming the monthly lease payments and the release of Foote.
 
 
 10
 In September or October 1985, Andrew Massimino of EDS contacted Douglas Perry, Foote's controller, to inquire about the requirements for consummating the settlement agreement. Perry instructed Massimino to contact Carol Neuwirth of FNB, who directed him to Henry Salmon of FNB, and William Pryor of WFR. On October 2, 1985, Massimino contacted Salmon regarding a lease assumption or buy out. Massimino stated that he "presented [Salmon] with a very general overview of the situation, without any details, that we would be assuming responsibility for their current lease with Foote Memorial." Salmon requested that Massimino send him a copy of the agreement between EDS and Foote, and EDS' financial statements for the past three years. Salmon told Massimino that he would also need the consent of Pryor and asked that Massimino send the requested materials to Pryor. Massimino stated that "[b]ased upon my conversation with Mr. Salmon and my subsequent conversations with Mr. Pryor, I believed that Mr. Pryor and WFR were the persons from whom I needed concurrence for EDS to assume the lease." This was the only time FNB was contacted by EDS or Foote regarding an assignment or buy out of the lease agreement until this lawsuit was filed in February 1987.
 
 
 11
 Massimino also telephoned Pryor, WFR's president, in order to obtain his consent. Pryor requested a copy of the Foote-EDS settlement and release agreement and a copy of EDS' 1984 Annual Report. Pryor reported that WFR agreed to the lease assumption on the condition that they receive $175,000 compensation for the adverse tax consequences which would result from the assignment. EDS and Foote did not agree to this condition and subsequently modified their agreement to eliminate the need for WFR's consent. Under the modified agreement, EDS made the monthly rental payments directly to FNB.
 
 
 12
 After January 1, 1987, Foote ceased to make rental payments to FNB, claiming defects in the PCIS and that WFR's unwillingness to consent to the lease agreement without receiving additional compensation constituted a breach of the lease agreement.
 
 
 13
 The disputes between Foote, FNB, EDS, and WFR gave rise to three lawsuits. The controversy before us involves Foote's suit against FNB and WFR, which was eventually consolidated with the first two suits. Foote sought a declaratory judgment relieving it of further lease payment obligations due to WFR's unreasonable refusal to consent to the assignment, credit for past payments made, and damages against WFR. Foote alleged in its claim against FNB that FNB was liable for WFR's unreasonable interference with the settlement because WFR "acted ... on behalf of ... and at the direction of FN[B]. FN[B] was fully aware of the proposed assignment and directed, and acted in concert with, WFR in demanding that payment of $175,000 be made as a condition of assignment." Foote alleged that because of FNB's unreasonable refusal to consent, Foote became discharged of any obligation it had to pay FNB as of October 1, 1986. Foote's claim was based on the belief that EDS would have commenced the lease payments had FNB and WFR accepted the assignment of the lease and that Foote thus would have been relieved of its duty to make further payments.
 
 
 14
 FNB counterclaimed, alleging breach of the lease agreement payments, fraud, misrepresentation, estoppel and unjust enrichment. FNB requested damages on an account stated under the lease agreement.
 
 
 15
 In March 1987, FNB informed Foote that as the lease was in default, FNB now had sole authority to consent to the proposed assignment of the lease and that it would consent. Foote claimed that WFR's refusal to consent to the proposed assignment of the lease agreement excused it from making further monthly payments.
 
 
 16
 FNB filed for summary judgment on the EDS and Foote settlement interference claims and on its counterclaim against Foote for lease payments. The magistrate recommended granting FNB's motion on both the Foote's claim and FNB's counterclaim. The district court adopted the report and recommendation and awarded FNB $619,841.25, the amount Foote allegedly owed FNB on the lease.
 
 A.
 Standard of Review
 
 17
 We review de novo the district court's grant of summary judgment. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Thus, we must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 
 18
 In order for there to be a genuine issue of material fact, the dispute must concern evidence upon which the jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party has the burden of establishing the nonexistence of a genuine issue of material fact, and doubt as to the existence should be resolved against the movant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). To meet its burden, the moving party need only point out the absence of evidence supporting the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the movant meets the initial burden of production, the nonmoving party must go beyond the pleadings to designate "specific facts showing that there is a genuine issue for trial." Id. at 324. The nonmoving party must do more than simply show that there is a metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable or not significantly probative, summary judgment may still be granted. Anderson, 477 U.S. at 249-50.
 
 B.
 
 19
 Grant of Summary Judgment for FNB on Foote's Claim
 
 1.
 Consent Necessary for Assignment of Lease
 
 20
 Foote argues that only FNB's consent to the assignment was required and that FNB authorized WFR to consent for it. FNB argues that the lease assignment agreements required both its and WFR's consent. The magistrate agreed that the documents required both FNB and WFR to consent.
 
 
 21
 Under the settlement and release agreement, EDS was required to provide written confirmation:
 
 
 22
 (i) that Lessor agrees to the terms and conditions of the assumption by EDS of responsibility and liability identified above and (ii) that upon the Effective Date the Lessor shall fully release and otherwise discharge FMH [Foote] from any responsibility or liability to Lessor or Lessor's assignees under the Lease Agreement.
 
 
 23
 The settlement and release agreement identifies WFR as the Lessor and thus WFR's consent was required under the agreement.
 
 
 24
 Foote argues that WFR's consent was not required because it previously assigned the lease and rental payments to Lancaster without recourse and granted Lancaster a security interest in the property. Lancaster then assigned to FNB, with recourse up to $175,000, the lease and rental payments, and granted FNB a security interest in the property. However, because the subsequent 1985 agreement specifically required WFR's consent, we believe its consent was required. Moreover, EDS' and Foote's behavior show that they also believed that WFR's consent was required. When Massimino of EDS asked Perry of Foote what steps he needed to take to complete the assignment, Perry gave him contacts at both WFR and FNB in order to obtain both companies' consent. Massimino in fact sought the consent of both companies. The consent of both companies was required.
 
 
 25
 The district court properly concluded that no factual issue existed regarding whose consent was required.
 
 2.
 Actual Agency
 
 26
 Actual authority is created through the principal's communications to the agent. Reuschlein and Gregory, Agency and Partnership, § 14 (1979). Foote contends that FNB made WFR its agent in connection with the lease assignment and is thus liable for WFR's unreasonable conditioning of its consent. The magistrate, however, concluded that there was no genuine issue of fact in the matter and that FNB did not constitute WFR its agent. The magistrate's conclusion rests in large part upon Pryor's unrebutted affidavit, that no actual agency relationship existed. In his affidavit, Pryor explains that FNB and WFR did not act together: WFR did not inform FNB of its actions, FNB did not direct WFR to handle the assignment in a particular way, WFR did not seek FNB's consent to its actions, and WFR did not act on FNB's behalf. These statements rebut Foote's contention that an actual agency relationship existed, as the agent stated that the principal never communicated to the agent its intent that the agent act on its behalf.
 
 
 27
 If the magistrate correctly shifted the burden to Foote, Foote argues that it met its burden by offering "significant probative evidence" of actual agency. Foote contends that the following evidence supports its claim: Massimino's affidavit, Pryor's and Salmon's deposition testimony, Foote's answers to interrogatory # 4, and Pryor's handwritten notes taken during a phone conversation regarding the consent to the lease assignment.
 
 
 28
 We disagree that any of this evidence shows the existence of an actual agency relationship. At summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. However, to avoid summary judgment, a nonmovant "must set forth some facts from which the court reasonably can infer that the party would be able to produce some evidence at trial to support its theory." Jones v. Nat'l Union Fire Ins. Co., 664 F.Supp. 440, 442 (N.D.Ind.1987).
 
 
 29
 Massimino's affidavit indicates that Salmon told Massimino that Pryor's consent was necessary and that based on his conversations with Salmon and Pryor, he believed only Pryor's consent was necessary for EDS to assume the lease. Massimino's statement that Salmon told him to contact Pryor does not show that WFR and FNB agreed that WFR would act on FNB's behalf. Under the lease agreements, WFR's consent was needed which is probably why Salmon referred him to Pryor. Moreover, as actual agency requires communication between the principal and the agent authorizing the agent to act for the principal, and as Massimino's affidavit describes only a third party's impressions of a relationship, it is not evidence that any communication occurred authorizing WFR to act for FNB.
 
 
 30
 Actual agency is not established by Pryor's deposition in which he states that he told Massimino that he represented the equity investor. Pryor expressly testified that he neither told Massimino that he was acting on FNB's behalf nor took any action which would have led Massimino to believe he acted for FNB.
 
 
 31
 Pryor's notes from his conversation with Massimino, stating "WFR agent" under the heading of FNB, are evidence of an agency relationship. Pryor, however, testified that his notes reflected Massimino's comments, not Pryor's understanding or knowledge of the relationship.
 
 
 32
 Finally, Foote pointed to prior instances where WFR acted as a go-between for FNB. In its answer to interrogatory 4, Foote lists all of the transactions and conversations leading Foote to believe that an agency relationship existed between WFR and FNB. Most of these events, however, occurred in 1983 when Pryor, as the broker, was acting as a go-between to accommodate Foote, the lessee, and FNB, the lender. Foote also contends that FNB's asking WFR to intervene when payments were late and WFR's sending Foote an automatic payment remittance form to solve the problem show an agency relationship. Salmon explained at deposition that he called WFR about the late payments "[b]ecause if soon after a transaction closes, where the broker has knowledge of the people involved, we don't get payment, it was just one of the things that we did; was to the call the broker and say, So-and-so has not paid us yet." These examples involve grants of limited authority in the past; they do not show that FNB asked WFR to act on its behalf in this instance. Thus, Foote did not establish a genuine issue of material fact regarding whether WFR and FNB actually agreed that WFR would act as FNB's agent.
 
 3.
 Apparent Agency
 
 33
 Apparent authority ... is found where the "agent" may or may not have actual authority to act for the principal, but because of the behavior of the "principal" the third party believes, in good faith, that the "agent" acts with authority. It arises usually when the "principal" allows a situation to exist causing the third party to be misled.
 
 
 34
 Reuschlein and Gregory, § 23. Where there is no contract between the innocent third party and the apparent agent, the principal may still be held liable on an estoppel theory:
 
 
 35
 Conduct which leads a third party to believe that the agent has authority and thus creates apparent authority to those persons who act upon it, frequently causes the principal to be liable to those who have changed their position in reliance to their detriment. So it is that the principal may be estopped from denying the authority of his agent The elements of estoppel are that (a) acts of commission or omission, instructional or negligent, by the principal create the appearance of authority of his agent; (b) the third party acts in reliance upon such appearance of authority, reasonably and in good faith and (c) the third party changes his position to his detriment in reliance upon the appearance of authority.
 
 
 36
 Reuschlein and Gregory, § 25.
 
 
 37
 Foote argues that Salmon's conversation with Massimino led EDS and Foote to believe that WFR was FNB's agent regarding the lease assignment. The magistrate, however, found that Foote failed to provide significant evidence on any of the three prima facie elements of apparent agency.
 
 
 38
 a.
 
 
 39
 Appearance of Authority and Good Faith Reliance
 
 
 40
 Foote argues that Salmon led it to believe that WFR was FNB's agent. During Massimino's conversation with Salmon, Salmon told him to contact Pryor at WFR and to send Pryor certain documentation. Massimino states that "[b]ased upon my conversation with Mr. Salmon and my subsequent conversation with Mr. Pryor, I believed that Mr. Pryor and WFR were the persons from whom I needed concurrence for EDS to assume the lease." This statement, however, is insufficient to establish an appearance of agency. Massimino does not state that he contacted Pryor in reliance on Salmon's comments nor could he reasonably allege that he did. Prior to contacting either Salmon or Pryor, Perry had told Massimino to obtain the consent of both WFR and FNB and had given him contacts at both companies. Massimino admitted that he "never had an opportunity to review all of the agreements between FN[B], WFR, and Foote. No one told me that the only consent required was from FN[B]." However, had Massimino reviewed the documents, it would have been clear that both WFR's and FNB's consent was required under the lease assignment agreements. The evidence, moreover, shows that even after talking to Salmon, Massimino believed he needed FNB's consent. After talking to Salmon, Massimino sent a letter to Foote's chief financial officer, Michael Blaszyk, reporting on his efforts "to get a confirmation from FN[B] that they will release Foote from responsibility for the lease." This letter also reported that Salmon had requested certain financial information which Massimino would send him directly; he did not indicate that Salmon told him to contact Pryor or to send the financial documents to Pryor. In a December 11, 1985 letter to Foote, Massimino suggested that Foote contact both WFR and FNB to review the proposal with them. Foote thus failed to show that any action taken by Salmon or FNB led Massimino to reasonably believe that WFR was FNB's agent.
 
 
 41
 b.
 
 Lack of Detrimental Reliance
 
 42
 Foote did not seem to offer any evidence on detrimental reliance nor does it appear that it could have because it did not change its position and suffer a loss due to the behavior of the "principal," FNB. We believe the magistrate was correct when he stated:
 
 
 43
 Here the alleged harm to EDS is losing out on the "Settlement and Release Agreement" that limited its exposure and would have avoided this suit. Here the alleged harm to Foote is in losing out on those portions of the Settlement and Release Agreement that would have ended their monthly rental payment and obligations and provided them a discharge of any liability under the lease.
 
 
 44
 Detrimental reliance might be demonstrated on the present facts if, prior to default in rental payments, only FN[B]'s consent was required for the lease assumption by EDS. Yet, as found as a matter of law above, prior to default the consent of both EDS and FN[B] was required.
 
 
 45
 Thus, the only harm to EDS and Foote that makes up the necessary "detriment" would have occurred anyway. Even if Salmon gave FN[B]'s consent on October 2, 1985, when he talked to Massimino, WFR would still have had to consent. There is no evidence submitted that the WFR $175,000 demand would not still have sabotaged the Foote/EDS Settlement and Release Agreement..... Absent a showing of detrimental reliance there can be no use of the estoppel principles of apparent authority, even if Salmon's behavior in October was sufficient to create an apparent authority in WFR, and even if EDS's reliance was reasonable and in good faith.
 
 
 46
 Foote, then, failed to establish any of the necessary elements of apparent agency.
 
 C.
 Summary Judgment on FNB's Counterclaim
 
 47
 In its counterclaim, FNB sought a judgment for the unpaid balance of the lease agreement plus interest, costs, and attorneys' fees. FNB asserted that it was entitled to the lease payments because the lease agreement and acknowledgment and consent to assignment made it clear that the obligation to make lease payments was independent of any obligations of EDS or WFR. Under section 3 of the lease agreement, the rent due from the lessee "shall not be subject to any defense, claim, reduction, set-off or adjustment for any reason whatsoever." Sections 4 and 8 state that no warranties are made other than good title, and that the lessor's obligations are not diminished by equipment problems. Section 10 provides that the rights and obligations would continue if the lease was assigned.
 
 
 48
 Finally, the acknowledgement and consent to assignment, signed on August 31, 1983, provided that WFR-Lancaster assigned the lease to FNB who had "no obligation to perform any of the Lessor's obligations and that notwithstanding any breach of the Lease by Lessor ... Lessee shall continue to make all monthly and other rental payments provided for in the Lease."
 
 
 49
 Foote contends that these so-called "hell and high water" provisions, which prohibit Foote from raising any defenses to payment, insulate FNB from breaches by the lessor but do not apply to FNB's own independent misconduct in refusing to consent. However, because Foote presented insufficient evidence of FNB's own independent misconduct, it had no defense to FNB's claim for rental payments and interest, and summary judgment was properly granted.
 
 D.
 Judgment of $619,841.25
 
 50
 The magistrate's report recommended that "FIRST NATIONWIDE BANK'S MOTION FOR SUMMARY JUDGMENT ON ITS COUNTERCLAIM ... be granted in an amount that includes all unpaid rent plus interest from the date such rent was due, computed at 1 1/2% per month, but without attorneys' fees...." The magistrate did not specify the amount due but recommended that FNB submit an accounting of the rent payments due. Foote did not object to this recommendation of the magistrate. On January 3, 1989, the district court accepted the report and recommendation and entered judgment in favor of FNB "in an amount that includes all unpaid rent plus interest from the date rent was due, computed at 1 1/2% per month." On February 24, 1989, FNB, submitting the affidavit of Terrence J. Wagner, President of First Nationwide Saving Corporate Funding, moved for entry of final judgment and the matter was once again referred to the magistrate to determine the amount. Foote opposed the entry of full lease payment damages because FNB failed to mitigate its damages by pursuing its recourse of $175,000 against Lancaster. The magistrate found that this argument was untimely as it was not raised in Foote's answer to the counterclaim or in its opposition to FNB's motion for summary judgment, nor did Foote object to the magistrate's report based on the magistrate's failure to consider the mitigation defense first raised at oral arguments on the motion for summary judgment. Moreover, the magistrate concluded that even if the theory was timely raised, it would fail on the merits as FNB had two alternate elective remedies: seeking recourse against Lancaster and suing Foote.
 
 
 51
 Foote argues that the magistrate erred in holding that the mitigation theory was untimely because it was not apparent until FNB submitted Wagner's affidavit that the amount of recovery sought included the $175,000 which FNB should have sought from Lancaster. In the alternative, Foote argues that it should have been allowed to amend its answer to FNB's counterclaim to assert the mitigation defense.
 
 
 52
 Since August 1987, when FNB filed its counterclaim seeking recovery of unpaid rent, the amount of rent due under the lease was an issue in the case. Mitigation should have been raised as an affirmative defense to this counterclaim. See Fed.R.Civ.P. 8(c). Even if Foote was not required to raise mitigation as an affirmative defense, it should have objected to the magistrate's report which did not address the mitigation argument Foote had raised at oral argument. Although the amount of damages awarded was undetermined at the time of the magistrate's first report and recommendation, it was clear that the magistrate recommended awarding "all unpaid rent." (Emphasis added.) As Foote had argued that it would owe only the unpaid rent less the amount FNB would have recovered if it had mitigated, it should have objected to the magistrate's finding that it pay "all unpaid rent." Our circuit has held that "a party shall file objections [to the magistrate's report] with the district court or else waive right to appeal." United States v. Walters, 638 F.2d 947, 950 (6th Cir.1981).
 
 
 53
 Even if Foote's mitigation argument was properly raised, the magistrate correctly found that the failure to mitigate would not affect FNB's recovery. The lease assignments provided FNB with remedies against both Lancaster and Foote. Under the lease, Foote's obligations to pay rent to any assignee "shall not be subject to any reduction, abatement, defense, set off, counterclaim or recoupment for any reason whatsoever...." Foote, then, cannot object to FNB's failure to seek $175,000 from Lancaster as Foote agreed to pay the rental payments regardless of what happened.
 
 III.
 
 54
 For the reasons stated above, we therefore AFFIRM the district court's grant of summary judgment.
 
 
 
 *
 The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation