**HORTON**

v.

**TELXON CORPORATION et al.**

Court of Common Pleas of Ohio,
Summit County.

No. CV 98 04 1356.

Decided Feb. 11, 1999.

*Katherine Hart Smith,* for plaintiff.

*Goodman Weiss Miller, L.L.P.,* and *Richard S. Mitchell,* for defendants.

TED SCHNEIDERMAN, Judge.

On April 3, 1998, the plaintiff, James Edward Horton, ("Horton"), filed a complaint against the defendants, Telxon Corporation ("Telxon"), HCK & Associates ("HCK"), and Aironet Wireless Communications, Inc. ("Aironet"), apparently alleging fraudulent misrepresentation, promissory estoppel, breach of contract, and tortious interference with a contract.

Telxon, HCK, and Aironet filed a joint answer on June 18, 1998. Telxon also filed a counterclaim against Horton on June 18, 1998, alleging unjust enrichment. Horton filed an answer to the counterclaim on June 25, 1998.

On December 22, 1998, the defendants filed a motion for summary judgment. On January 4, 1999, Horton filed a response and then filed a supplemental response on January 19, 1999. On the latter date, the defendants filed a reply.

The issues raised by the defendants' motion for summary judgment are now deemed submitted.

The relevant facts, at all pertinent times, taken in a light most favorable to the nonmoving party, Horton, are as follows:

1. Horton is a fifty-six-year old African–American with a background in recruitment, placement, and employee relations.

2. Telxon is a Delaware corporation licensed to do business in Ohio, and headquartered in Fairlawn.

3. HCK, Aironet, Metanetics, and Accipter are all subsidiaries and/or affiliates of Telxon operating in Summit County, Ohio.

4. Telxon's officers include Robert Meyerson—Chairman of the Board and Chief Executive Officer ("Meyerson"); Frank Brick—President and Chief Oper-

ating Officer ("Brick"); and Meg Pais—Vice President Employee Services ("Pais").

5. From 1992 to 1994, Horton worked as a consultant to Meyerson. He was responsible for strategic recruitment and was retained on a monthly basis.

6. In July 1994, Telxon hired Horton as Vice President–Employee Services. Horton worked in this position until December 1995.

7. In December 1995, Horton was transferred to the lateral position of Vice President–Sales Support. Horton was subsequently demoted to Project Manager in spring 1996. Horton earned $125,000 annually. At all times, Horton was an employee at will.

8. On July 19, 1996, Horton was terminated by Telxon. He was not entitled to any severance payment.

9. During the July 19 meeting, Horton's separation package was discussed with Brick and Pais. Horton requested that he receive the same consideration as his predecessors who had received a severance package equal to their annual salaries as well as consulting agreements. Horton was instructed to contact Meyerson regarding any future consulting position.

10. On approximately July 20, 1996, Horton received a proposed separation agreement which included provisions for $125,000 severance and a release.

11. Horton met with Meyerson on approximately July 23 or 24, 1996. Meyerson advised Horton that he had created HCK and Horton would be added to its payroll at $125,000 per year. Meyerson was unaware that Horton had been terminated and/or offered severance.

12. Afterwards, on approximately July 24 or 25, 1996, Horton met with Meyerson, Kessler (President of HCK), and Chambers (Meyerson's assistant). During this meeting, Horton was made HCK's Senior Vice President—Director of Executive Recruiting. They discussed a proposed agreement and made office arrangements.

13. On July 25, 1996, HCK sent Horton a draft of the proposed HCK agreement. The proposed agreement was for one year and was renewable at the option of HCK on an annual basis. The proposal contained no bonus.

14. On August 5, 1996, Horton accepted the proposed HCK agreement and executed the Telxon separation agreement. He returned the executed separation agreement to Pais's office.

15. Thereafter, on the same date, Horton received a fax from Pais stating that Telxon had not and would not accept the separation agreement and HCK agreement until the terms were clarified in a meeting scheduled for August 6, 1996.

16. On August 6, 1996, Horton met with Brick and Pais. Brick told Pais to draft an agreement between Telxon and Horton. The new agreement did not provide for a fixed payment but only for a potential bonus.

17. On December 5, 1996, Horton and Aironet entered into a written agreement for consulting services. The agreement provided for services commencing on November 1, 1996 and ending February 28, 1997. The agreement gave Aironet the option to extend the terms on a month-to-month basis for three consecutive months.

18. After the above agreement expired, Horton continued to perform consulting services for Aironet until early 1998. All of these consulting services were performed satisfactorily.

19. Aironet ended Horton's consulting services as evidenced by Brick's memo dated February 4, 1998, indicating that Horton's services should no longer be used due to "confidentiality, rumormongering and lack of trust."

20. Horton received from Telxon approximately $125,000 in severance payments as agreed.

21. After his termination, Horton did consulting work for Telxon, Metanetics and Aironet. Starting in July 1996 to February 1998, Horton was paid approximately $99,000 by Aironet, $33,000 by Metanetics, and $2,000 by Accipiter or a total of $134,000 for consulting services.

Summary judgment proceedings are governed by Civ.R. 56. Civ.R. 56(C) requires that before a summary judgment is granted it must be shown that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. To grant such motion, it must be found that, " '(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.' " *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 346, 617 N.E.2d 1129, 1132, quoting *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274. A successful motion for summary judgment rests on a two-part foundation: (1) that there is no genuine issue as to any material fact and (2) the moving party is entitled to a judgment as a matter of law. The moving party for summary judgment has the burden of showing that no issue exists of any material fact. *State v. Licsak* (1974), 41 Ohio App.2d 165, 170, 70 O.O.2d 325, 328, 324 N.E.2d 589, 593–594.

The Ohio Supreme Court has stated: "Summary judgment is a procedural device to terminate litigation and to avoid a formal trial where there is nothing to

try. It must be awarded with caution, resolving doubts and construing evidence against the moving party * * *." *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 2, 24 O.O.3d 1, 2, 433 N.E.2d 615, 616. See, also, *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 11–12, 13 OBR 8, 11–14, 467 N.E.2d 1378, 1382–1384. As the evidence is examined, the inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, and if when so viewed reasonable minds can come to differing conclusions, the motion should be overruled. *Hounshell v. Am. States Ins. Co.* (1981), 67 Ohio St.2d 427, 433, 21 O.O.3d 267, 271, 424 N.E.2d 311, 314–315.

The standard for granting a judgment under Civ.R. 56 was most recently stated in *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274:

"[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied."

Horton's complaint apparently alleges four separate counts, which are summarized as follows:

Count I—Telxon fraudulently misrepresented Horton's future employment status;

Count II—Horton reasonably relied upon representations by Telxon and HCK to his detriment;

Count III—Aironet breached its written agreement with Horton;

Count IV—Telxon tortiously interfered with Horton's contractual relationship with Aironet.

### Count I: *Fraudulent Misrepresentation*

Horton claims that Telxon promised employment in exchange for his signing the separation agreement and release. Horton maintains that he relied upon Telxon's written and verbal representations and that Telxon subsequently breached its promise to retain Horton's services. Horton claims that Telxon fraudulently and intentionally misled him.

■ In paragraph two of the syllabus in *Burr v. Stark Cty. Bd. of Commrs.* (1986) 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, the court set forth the elements of fraud as follows:

"(a) a representation or, where there is a duty to disclose, concealment of a fact,

"(b) which is material to the transaction at hand,

"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

"(d) with the intent of misleading another into relying upon it,

"(e) justifiable reliance upon the representation or concealment, and

"(f) a resulting injury proximately caused by the reliance."

After Horton's termination, there were many conversations and drafts of proposed agreements for consulting services. However, no agreement was made until the contract with Aironet in December 1996. There was no definite promise of consulting services, or any type of employment, prior to the Aironet contract. Soon after his termination from Telxon, Horton performed consulting services for Telxon and its subsidiaries including Aironet, until his services ended in February 1998.

The record before this court does not suggest that false statements were made or that there was any intent to mislead Horton into believing that he did in fact have a secured, long-term position within the company. After Horton was terminated, Telxon never promised Horton anything other than consulting services.

■ Further, both before and after Horton's termination and until the Aironet agreement, any reliance by Horton was unjustified. Horton knew that his employment with Telxon was at will and it could be terminated at any time, and until the Aironet contract, Horton knew the consulting services were on an as-needed basis and could end at the discretion of Telxon and/or its subsidiaries.

■ Finally, Horton is not able to demonstrate any injury caused by his claimed reliance. In exchange for his release, Horton received approximately $125,000 severance from Telxon and an additional $134,000 in consulting fees from Telxon and its subsidiaries.

There is nothing in the record to reasonably warrant the conclusion that representations concerning Horton's status were falsely made or made with the intent to mislead. Even assuming that false representations with the intent to mislead were made, there could be no reasonable reliance and/or damage.

Accordingly, as to Count I, fraudulent misrepresentation, summary judgment should be granted.

### Count II: *Promissory Estoppel*

Horton argues that he relied upon Telxon's promise of continued employment and, in doing so, executed the separation agreement thereby ending his employment. Horton argues that Telxon should be estopped from backing out of its promise. Promissory estoppel is a remedy allowing enforcement of a promise upon which another relies and/or changes his position and suffers due to his reliance.

The doctrine of promissory estoppel is set forth in 1 Restatement of the Law, Contracts 2d (1981) 242, Section 90, which states:

"A promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

This rule has been adopted in Ohio. See *Talley v. Teamsters Local No. 377* (1976), 48 Ohio St.2d 142, 146, 2 O.O.3d 297, 299–300, 357 N.E.2d 44, 47; *McCroskey v. State* (1983), 8 Ohio St.3d 29, 30, 8 OBR 339, 340–341, 456 N.E.2d 1204, 1204–1205.

There is nothing before this court to suggest that Telxon or its subsidiaries ever made an unambiguous promise to Horton for future employment and/or consulting services. On the contrary, the record reflects many conversations with conflicting statements concerning Horton's consulting services. Horton knew, or reasonably should have known, that representatives of Telxon and its subsidiaries were making conflicting statements, and no actual agreement for consulting services was made until the December 1996 agreement with Aironet.

Horton performed consulting services for a number of different entities of Telxon and worked for many different people on numerous projects, and it would be impossible to say he relied upon any one person's representations.

There is nothing in the record to demonstrate that Horton took any particular action or refrained from taking a particular action based on the fact that he believed he had a promise of continued income. Horton knew, or reasonably should have known, that he could be terminated at any time. There was nothing for Horton to reasonably rely upon. Horton cannot point to any specific damages, as he was paid his severance and consulting fees in the total sum of approximately $259,000.

Accordingly, as to Count II, promissory estoppel, summary judgment should be granted.

## Count III: *Breach of Contract*

█ Horton alleged that Aironet terminated their contract in violation of its terms and conditions.

Horton and Aironet entered into a signed contract for consulting services on December 5, 1996. The terms of this agreement provided for four months of service commencing November 1, 1996 and ending February 28, 1997. The agreement provided that Aironet "shall have the option to extend the terms of this Agreement on a month-to-month basis for three consecutive months." In addition, the agreement further provided that any modification of the terms must be in writing and that the written agreement constituted the entire agreement without relying on any other representations, written or oral.

After the agreement had expired, Horton continued to provide consulting services to Aironet for nearly a year. When Aironet ended Horton's services, neither party was bound by any agreement.

Subsequent to the expiration of the Aironet agreement, Horton, on at least one occasion, attempted to renew or renegotiate his agreement with Aironet. Aironet declined. Horton knew the agreement had expired.

Therefore, summary judgment should be granted as to Count III, breach of contract.

## Count IV: *Tortious Interference with a Contractual Relationship*

█ The fourth count of Horton's complaint argues that Telxon intentionally interfered with Horton's contract with Aironet when Brick faxed Murphy a memo instructing him to end Aironet's use of Horton's services.

In paragraph two of the syllabus in *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, the court stated as follows:

█ "In order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages."

The first and most essential element of a claim for tortious interference is the existence of a contract. As concluded in the discussion of Count III, there was no contract in existence at the time Aironet ended Horton's services. Because no contract existed, there can be no tortious interference with a contractual relationship.

█ Notwithstanding the fact that there is no contract, a parent company cannot tortiously interfere with a contract of a subsidiary. In *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.* (C.A.6, 1988), 862 F.2d 597, at 601, the

court determined that a parent company was privileged to interfere with a contract made between its subsidiary and a third person, because the parent effectively stands in the subsidiary's shoes.

Therefore, as to Count IV, tortious interference with a contractual relationship, summary judgment should be granted.

IT IS ORDERED AND ADJUDGED that the motion for summary judgment filed by defendants, Telxon Corporation, HCK & Associates and Aironet Wireless Communications, is GRANTED.

FURTHER, IT IS ORDERED AND ADJUDGED that the complaint of the plaintiff, James Edward Horton, is DISMISSED with prejudice and on its merits.

FINALLY, IT IS ORDERED that the plaintiff pay the costs of this action.

*So ordered.*