980 F.2d 729
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CREDIT BUREAU SERVICES OF NORTHEASTERN OHIO, INC., Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 91-3655.
 United States Court of Appeals, Sixth Circuit.
 Nov. 24, 1992.
 
 Before RALPH B. GUY, Jr., ALAN E. NORRIS and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff, Credit Bureau Services of Northeastern Ohio, Inc. ("CBS"), appeals the district court's granting of summary judgment in favor of the United States. CBS presented numerous arguments before the district court and this court as to why it considers itself entitled to a federal income tax refund for the 1988 tax year in the amount of $5,604,753, plus interest. Finding these arguments without merit, we affirm the district court's decision.
 
 I.
 
 2
 CBS was a nonprofit, but taxable corporation, formed in the early 1900s for the purpose of providing credit reporting and collection services to its customer-members, which included Cleveland area banks, department stores, utilities, and other commercial establishments.
 
 
 3
 Under the arrangement between CBS and its customer-members, the latter supplied CBS free of charge with updated credit information they possessed. In return, CBS compiled the data and then shared it for a small fee with the customer-members in the form of credit reports. In addition to the fee paid for credit reports or collection services, customer-members paid a nominal membership fee. CBS had no shareholders, and no one had an ownership interest in the company.
 
 
 4
 In 1987, CBS adopted an asset distribution plan ("the Plan") to be followed in the event the business was sold. The Plan provided that in the event of a sale, the money remaining after the payment to CBS employees of an amount equal to ten percent of the net proceeds (defined as sale proceeds less all outstanding liabilities, taxes, and other expenses) would be distributed to its customer-members based upon the extent to which each had used CBS' services and provided it with credit information.
 
 
 5
 In March 1988, Trans Union Credit Information Company ("Trans Union") purchased substantially all of CBS' assets for $18.5 million. In June, CBS adopted a dissolution plan which provided for the distribution of CBS' assets in accordance with the Plan.
 
 
 6
 In July 1988, CBS requested a letter ruling from the Internal Revenue Service ("IRS") in order to determine the taxability of the $16,432,329 sale proceeds that were to be distributed to its customer-members pursuant to the Plan. According to the IRS, the sale proceeds were taxable. CBS paid the taxes and brought a refund suit in federal district court pursuant to 28 U.S.C. § 1346(a)(1).
 
 
 7
 CBS presented three alternative arguments to the district court. First, it argued that the Trans Union sale proceeds that it distributed to its customer-members are excludable from CBS' gross income because it had an obligation to distribute the money to its customer-members. Second, CBS contended that even if the amount distributed constitutes gross income, it is deductible as an ordinary and necessary business expense. Finally, CBS argued that the sale proceeds should be applied to the basis of the assets that were sold, thereby reducing the amount of realized gain from the sale.
 
 
 8
 The district court rejected CBS' first and second arguments, stating that "there is no authority that supports the position that these payments are deductible or excludable simply because they were made to satisfy an obligation to a customer or supplier of property." With respect to CBS' third argument, the district court stated that "[n]othing presented to this Court demonstrates that CBS' customers provided CBS with credit information with the expectation that this information would be sold." Accordingly, the district court granted the government's motion for summary judgment.
 
 
 9
 We review the district court's decision de novo. A district court's granting of summary judgment should be sustained if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 II.
 
 10
 CBS first argues that the proceeds from the Trans Union sale that were distributed to its customer-members may be excluded from CBS' gross income.
 
 
 11
 "Gross income" is defined in 26 U.S.C. § 61 as "all income from whatever source derived." 26 U.S.C. § 61(a). In a recent opinion, the Supreme Court noted that § 61 defines gross income in an expansive manner that includes "all income from whatever source derived, subject only to the exclusions specifically enumerated elsewhere in the Code." United States v. Burke, 112 S.Ct. 1867, 1870 (1992). The opinion noted that "Congress intended through § 61(a) and its statutory precursors to exert 'the full measure of its taxing power,' and to bring within the definition of income any 'accession to wealth.' " Id. (citation omitted) ( quoting Helvering v. Clifford, 309 U.S. 331, 334 (1940) and Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)).
 
 
 12
 CBS contends that its history of doing business with its customers and the terms of the Plan required it to distribute the sale proceeds and, since it had no right to retain the proceeds, they do not constitute gross income. As support, CBS relies upon James v. United States, 366 U.S. 213 (1961), in which a plurality of the Supreme Court held that a taxpayer has taxable income when the taxpayer "has such control over it that, as a practical matter, he derives readily realizable economic value from it." Id. at 219 ( quoting Rutkin v. United States, 343 U.S. 130, 137 (1952)). CBS maintains that it had no control over the sale proceeds because it was required to distribute most of the proceeds to the customer-members.
 
 
 13
 We disagree, since we conclude that CBS did enjoy sufficient control over the sale proceeds to warrant their inclusion in gross income. The Supreme Court has liberally construed "gross income" in recognition of the congressional intent to tax all gains except those specifically exempted. Commissioner v. Jacobson, 336 U.S. 28, 49 (1949). When a taxpayer acquires income without obligation to repay it (as opposed to a loan, for example) and without restriction as to its disposition, it is considered taxable income, even though the taxpayer ultimately may not be entitled to retain the money. See James, 366 U.S. at 219 (embezzled funds includable in gross income).
 
 
 14
 CBS nevertheless seeks to characterize the Plan as an obligation to "repay," "refund," or "return" assets to its customer-members and argues that the proceeds of sale should be excluded from CBS' gross income, since in distributing part of the proceeds to customer-members, it was refunding money to those who had created the value of the assets sold. That argument might be more persuasive if the Plan called for distribution to only those who had furnished credit information to CBS. However, the Plan's distribution formula gives weight to both data furnishing and report purchasing. It is difficult to comprehend how one who only used the credit reporting service, without having ever contributed information to CBS' credit information data base, can be said to have received under the Plan a "refund" of value it had created.
 
 
 15
 Even had the Plan called for distribution to only those customer-members who furnished credit information to CBS, that information was not sold to CBS, but contributed free of charge. The value of any individual bit of information contributed would be slight in comparison with the value of the credit file data base which CBS produced by combining and organizing all the individual bits of information. The value of the whole data base greatly exceeded the sum of the parts. It is the increased value of the data base created by CBS that is being taxed. The long-standing arrangement between CBS and its customer-members contemplated that they would be compensated for the value of the information they contributed, by obtaining access to the data base and by receiving services at a lower cost. Since the sale price of CBS' credit files was based upon the value of the new data base created by CBS from the various information it gathered, CBS' distribution of sale proceeds cannot be considered a refund of value contributed by customer-members.
 
 
 16
 Furthermore, CBS was not obligated or required to distribute the sale proceeds to customer-members to the extent necessary to preclude its inclusion in gross income. The Plan, which took the form of a corporate resolution, includes this language:
 
 
 17
 This plan may be amended, supplemented, altered or terminated at any time by a majority of the members of [CBS] which hold the Class A Membership Certificates present at a meeting called for such purpose. Nothing contained in the Plan of Distribution, nor any amendment thereto, shall be construed as creating any vested right of any nature in any ... [customer-patron] of [CBS].... The undertakings of [CBS] hereunder constitute merely the unsecured promise to make the payments as provided for herein. No property of [CBS] shall be, by reason of this Plan, held in trust for any [customer-member] and neither any [customer-member] shall have, by reason of this Plan, any rights, title or interest of any kind in or to any property of the [customer-member]....
 
 
 18
 This language plainly establishes that the Plan's distribution scheme was not binding on CBS because the Plan could be altered at any time by a simple majority vote of the few members who held Class A membership, and because customer-members enjoyed no enforceable right to payment under the Plan. Accordingly, the Plan created no binding obligation on CBS to distribute the sale proceeds to its customer-members. Nor does the history of the business relationship between CBS and its customer-members, as recited in CBS' brief, give rise to any binding legal obligation on the part of CBS to pay over the sale proceeds.
 
 
 19
 Thus, because there was no binding obligation to "repay" any value loaned to it, CBS enjoyed sufficient control over the sale proceeds to warrant including them as gross income.
 
 III.
 
 20
 CBS next argues that the sale proceeds distributed to its customer-members are deductible as a business expense.
 
 
 21
 Business expense deductions are governed by 26 U.S.C. § 162, which provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a).
 
 
 22
 The Supreme Court has defined "ordinary" as "normal, usual, or customary," and that "the transaction which gives rise to [the expense] must be of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940). The Supreme Court defined "necessary" as " 'appropriate and helpful' for 'the development of the taxpayer's business.' " Commissioner v. Tellier, 383 U.S. 687, 689 (1966) ( quoting Welch v. Helvering, 290 U.S. 111, 113 (1933)).
 
 
 23
 CBS contends that its ultimate obligation to distribute the sale proceeds arose as a means of inducing customers to do business with it. CBS therefore views its distribution of the sale proceeds as an ordinary and necessary expense that is central to the carrying on of a trade or business.
 
 
 24
 CBS, however, was in the business of providing credit reporting and collection services, not of liquidating its assets. The distribution of proceeds received after a corporation has gone out of business is not an "ordinary" or "frequent" business expense, and therefore is not deductible pursuant to 26 U.S.C. § 162.
 
 IV.
 
 25
 CBS' final argument is that even if the distributed proceeds constitute gross income and are not deductible as a business expense, it may nonetheless adjust its basis in the assets sold by the amount of sale proceeds distributed, that is, $16,432,329.
 
 
 26
 CBS advances two theories to support its argument. First, CBS contends that it promised to make the distribution in exchange for credit information and patronage; therefore the amount distributed equals CBS' cost for the property sold. Second, CBS argues that it incurred its distribution obligation in order to preserve its assets pending sale; therefore, the amount distributed is a capital cost incurred in the disposition of capital assets.
 
 
 27
 The amount of gain that is realized from the sale of an asset is governed by 26 U.S.C. § 1001(a), which provides that "[t]he gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain." 26 U.S.C. § 1001(a). Section 1011(a) provides that "[t]he adjusted basis for determining the gain or loss from the sale or other disposition of property ... shall be the basis (determined under section 1012 or other applicable sections of this subchapter ...), adjusted as provided in section 1016." 26 U.S.C. § 1011(a). Section 1012 provides that, in general, the basis of a particular item of property is its cost. 26 U.S.C. § 1012.
 
 
 28
 CBS' arguments fail for several reasons. First, CBS' customer-members did not provide their credit information for the purpose of resale. Second, the credit information provided by the individual customer-members greatly appreciated in value once CBS compiled all the data. Third, CBS was not formed for the purpose of selling the credit files furnished by its customer-members; rather, its purpose was to share the credit information with them for a fee. CBS never paid for the credit files, and it sold them only upon liquidation. Fourth, according to the terms of the Plan, the amount of credit information each customer-member provided to CBS was only a factor in determining the amount of that customer-member's liquidation distribution. Finally, as the government points out, even if CBS did adjust its basis to reflect the value of the credit files, a substantial portion of Trans Union's purchase price was allocated to items that the customer-members did not provide. For example, $1.5 million was allocated to collection files, $1 million to a noncompetition covenant, and approximately $1.3 million to working capital. For these reasons, it is clear that the $16,432,329 distributed to CBS' customer-members does not constitute CBS' cost for the assets sold, nor does it constitute a capital cost incurred in the disposition of capital assets. Accordingly, CBS may not adjust its basis upward by $16,432,329.
 
 
 29
 For the reasons set out above, the judgment of the district court is affirmed.